1998-NMSC-015

961 P.2d 768

STATE of New Mexico, ex rel., J. Paul TAYLOR, Murray Ryan, Mary Jane Garcia, Rita Harrington, Jeanette Jordan, Dorothy Martinez, Norma Ruiz, Patricia Quintana and Roberta Vasquez, Petitioners,

v.

Hon. Gary JOHNSON, Governor of the State of New Mexico, and William H. Johnson, Secretary of the New Mexico Human Services Department, Respondents.

No. 24547.

Supreme Court of New Mexico.

May 29, 1998.

Freedman, Boyd, Daniels, Hollander, Guttman & Goldberg, Joseph Goldberg, Michael B. Browde, Robert C. Erickson, New Mexico Center on Law and Poverty, Peter M. Cubra, Albuquerque, for Petitioners.

Hinkle, Cox, Eaton, Coffield & Hensley, L.L.P., Thomas M. Hnasko, Jeffrey L. Fornaciari, Santa Fe, for Respondents.

Tom Udall, Attorney General, Patrick T. Simpson, Craig B. Fredwell, Monica M. Ontiveros, Corliss G. Thalley, Elizabeth A. Glenn, Assistant Attorneys General, Santa Fe, for Amicus Curiae.

## OPINION

BACA, Justice.

{1}  The Constitution of the State of New Mexico commands that "[t]he powers of the government of this state are divided into three distinct departments, the legislative, executive, and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the oth-

ers...." N.M. Const. art. III, § 1. The case before us does not concern the merits of public assistance reform or conflicts of political ideology. Rather, it concerns only the sanctity of the New Mexico Constitution and the judiciary's obligation to uphold the principles therein. "It is the function of the judiciary ... to measure the acts of the executive and the legislative branch solely by the yardstick of the constitution." *State v. Mechem*, 63 N.M. 250, 252, 316 P.2d 1069, 1070 (1957), *overruled on other grounds by Wylie Corp. v. Mowrer*, 104 N.M. 751, 726 P.2d 1381 (1986). It is with this yardstick that we take the measure of this case.

{2} This case began as a challenge of the power of the Executive to effect an extensive overhaul of the state's public assistance system without legislative participation. In the course of the proceedings before this Court, two issues presented themselves. First, the question arose whether Respondents had exceeded their constitutional powers in enacting and implementing certain welfare regulations. Subsequently, after this Court ruled Respondents had violated the constitutional provisions established by the separation of powers doctrine, the question arose whether Respondents had honored this Court's order. This question implicated an even more fundamental concept: respect for the rule of law. We address both questions in this opinion.

{3} Petitioners filed a Verified Petition for a Writ of Mandamus directed at Governor Gary Johnson and the Secretary of the New Mexico Human Services Department[1] (Respondents). Petitioners alleged that Respondents exceeded their constitutional authority by implementing significant public assistance policy changes without legislative approval. This Court, in a decision rendered from the bench on September 10, 1997, held that Respondents violated the separation of powers provision in Article III, Section 1 of the New Mexico Constitution. Pursuant to this holding, we issued a Writ of Mandamus requiring Respondents: 1) to desist from the implementation of their public assistance changes; and 2) to administer the public assistance program in full compliance with existing law until it is constitutionally altered or amended by legislation signed into law by the Governor.

{4} On October 24, 1997, Petitioners filed a motion to hold Respondents in contempt of court, alleging that Respondents were continuing to implement their public assistance changes. On December 10, 1997, the Court held a hearing requiring Respondents to show cause why this Court should not hold them in contempt for failing to comply with the Writ.

{5} We first restate the holding and fully articulate the reasoning behind our September 10, 1997, decision holding that Respondents violated Article III, Section 1 of the state constitution. Second, we determine that Respondents have not complied with the Writ and, therefore, hold Respondents in indirect civil contempt.

## I.

{6} Congress enacted the federal Aid to Families with Dependent Children program (AFDC) as part of the Social Security Act of 1935. *See* 42 U.S.C. §§ 601–687 (1994). AFDC created a new federal-state public assistance partnership. The federal government established the primary framework for public assistance programs and offered funding for states that implemented their programs consistent with federal guidelines.

{7} Soon after the federal government passed AFDC, New Mexico elected to join the federal program, passing implementing legislation now called the Public Assistance Act (NMPAA), NM Laws 1937, ch. 18.[2] The

---

1. The petition named then-Secretary Duke Rodriguez as a party. Secretary Rodriguez resigned during the course of these proceedings. His replacement, Bill Johnson, as current HSD Secretary, is now a party to this matter and subject to this Court's decision.

2. The original 1937 legislative enactment was not entitled the "Public Assistance Act." The Legislature, in amending the original enactment in 1973, created this title and designated various sections of Chapter 27, Article 2 for which the title applied, NMSA 1978, § 27-2-1 (1973), including some sections of the original enactment, *e.g.*, NMSA 1978, § 27-2-17 (1937). Other sections of the original enactment, *e.g.*, NMSA 1978, § 27-1-2 (1937), are not included within the scope of the officially-titled Public Assistance Act. Section 27-2-1.

NMPAA authorizes administration of the AFDC program and sets the basic formula for determining eligibility. NMSA 1978, § 27–2–5(A) (1982). The Legislature also created the New Mexico Human Services Department (HSD), NMSA 1978, § 27–1–1 (1977), to work with the federal government in administering public assistance programs. NMSA 1978, §§ 27–1–2 (1937), 27–1–3 (1982), 27–2–15 (1937).

{8} In the decades following passage of federal AFDC, Congress made major adjustments to the program. In such instances, the New Mexico Legislature passed, and a governor signed into law, bills adopting the federal changes in New Mexico. *See, e.g.,* NMSA 1978, § 27–2–10 (1973) (food stamp program); NMSA 1978, § 27–2–12 (1973, as amended 1993) (medical assistance); NMSA 1978, § 27–2–6.2(A) (1988) (work requirements).

{9} The most recent change in federal AFDC occurred with the enactment of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996(PRA), Pub.L. 104–193, 110 Stat. 2105 (codified at 42 U.S.C.A. §§ 601–19 (West Supp.1997)). The PRA repealed federal statutory and regulatory constraints on state administration of public assistance, permitting the states to create their own programs. To increase states' flexibility, the PRA replaced the former AFDC funding structure with a block grant program called Temporary Assistance to Needy Families (TANF). States now are eligible to receive TANF funds and use them as they wish in their own programs, subject only to minimal federal PRA guidelines.[3]

{10} The PRA's passage spurred legislative and executive action in New Mexico. Anticipating federal public assistance reform legislation in 1995, Governor Johnson submitted a state public assistance reform bill to the New Mexico Legislature in the 1996 legislative session. However, the bill died after failing to reach the floor of the New Mexico House of Representatives. After Congress passed and the President signed the PRA in 1996, the New Mexico Legislature, this time on its own initiative, began considering public assistance reform during its 1997 session. The New Mexico House of Representatives and Senate both passed substantially identical bills both known as the Family Assistance and Individual Responsibility Act (FAIR). The Act would have created a new NMPAA section to accommodate the TANF block grant program requirements and would have authorized HSD to administer the program.

{11} Soon thereafter, Governor Johnson vetoed the FAIR Act and line-item vetoed language in the General Appropriations Act that allotted money for the FAIR program. He stated in his veto messages that, as the Executive, he possessed authority to exercise the discretion left to the states under the PRA. House Executive Message No. 14 (3/19/97). The Governor argued that the proposed state legislation encroached upon the executive's authority. *Id.*

{12} Immediately following his veto, Governor Johnson announced the creation of his own public assistance reform plan, a program he labeled "PROGRESS." His proposed plan modified aspects of public assistance eligibility, support services, and delivery in New Mexico. Governor Johnson also stated that he intended to implement the program's public assistance changes through administrative regulation. Subsequently, HSD held public hearings regarding the proposed regulatory changes, and Respondents' program was adopted, taking effect on July 1, 1997.

{13} On July 21, 1997, Petitioners filed a Verified Petition for Writ of Mandamus. The Petitioners asserted that Governor Johnson and then-Secretary of HSD, Duke Rodriguez, unlawfully implemented Respondents'

---

3. The PRA limits TANF block grant eligibility to federally approved state plans that: 1) generally limit lifetime benefits using federal funds to a period no longer than five years; 2) reduce assistance for a recipient's failure to cooperate in establishing paternity or in payments of child support; 3) eliminate aid to teenage parents who do not attend high school or other equivalent training programs; 4) generally deny assistance to teenage parents who do not live in adult-supervised settings; 5) deny assistance to minor children who are absent from the home for a significant period; 6) impose mandatory work requirements; and 7) receive appropriated TANF grant funds from their state legislature. Pub.L. 104–193, §§ 103, 901, 110 Stat. 2105, 2134–42 (Sec.408), 2347.

program without seeking legislative approval, in violation of both state statute and the New Mexico Constitution's separation of powers provision. This Court held oral argument on September 10, 1997. In a unanimous decision, the Court ruled from the bench that Respondents had violated the New Mexico Constitution, Article III, Section 1. The Court ordered Respondents to:

a) desist from the implementation of their PROGRESS program, and b) to administer the Public Assistance Program in full compliance with New Mexico statutes until such time as existing law is altered or amended by the passage of a bill by the state legislature which is then signed into law by the governor in accordance with the provisions of the New Mexico Constitution.

Transcript of Oral Argument at 36 (9/10/97). When announcing the holding, the Chief Justice also asked the parties, "Are there any questions from counsel?" *Id.* There were none, and the Court issued the Writ.

## II.

{*14*} As a threshold matter, we address whether the Verified Petition for Original Writ of Mandamus is properly before this Court. Specifically, we consider two sub-issues: 1) whether this action is properly before this Court as an original proceeding; and 2) whether a writ of mandamus will issue to enjoin a state official from acting or whether it will only issue to compel an official act.

{*15*} This Court has original jurisdiction in this proceeding pursuant to Article VI, Section 3 of the New Mexico Constitution. The Court may invoke original jurisdiction even when a matter might have been brought first in the district court. *See* Rule 12–504(B)(1)(b) NMRA 1998 (party seeking mandamus must set forth circumstances making Supreme Court's exercise of original jurisdiction necessary and proper); *see also State ex rel. Clark v. Johnson,* 1995–NMSC–051, 120 N.M. 562, 569, 904 P.2d 11, 18 (discussing the criteria relevant to the exercise of original jurisdiction).

{*16*} In *State ex rel. Clark,* two state legislators and a taxpayer sought a declaratory judgment and either a writ of mandamus or a writ of prohibition to preclude Governor Johnson from implementing Indian gaming compacts and revenue-sharing agreements that were entered without legislative consent. *See State ex rel. Clark,* 1995–NMSC–051, 120 N.M. at 566, 904 P.2d at 15. This Court exercised original jurisdiction because: 1) the issue presented a fundamental question of great public concern; 2) the relevant facts were virtually undisputed and no further factual questions existed for the district court to decide; 3) the purely legal issue eventually would have come before this Court; and 4) the petitioners and the respondents desired an early resolution of the dispute. *State ex rel. Clark,* 1995–NMSC–051, 120 N.M. at 569, 904 P.2d at 18.

{*17*} We conclude that similar facts in this case provide a basis for our exercise of original jurisdiction. The Respondents' actions implicate the doctrine of separation of powers. The balance and maintenance of governmental power is of great public concern. Also, no factual issues require further clarification; this dispute concerns a purely legal question—the limits upon executive and legislative power under the state constitution. Moreover, because of these questions' significance to the balance of power among government branches, we have no doubt that they eventually would have reached this Court. Last, early resolution of this case is desirable. As public assistance reform proposals are made, it is important that both the legislative and executive branches clearly understand their constitutional obligations and limitations. Furthermore, since the conclusion of this case affects numerous citizens and the efficient administration of public assistance, an immediate hearing of these issues benefits all concerned parties. Therefore, it is both necessary and proper for this Court to exercise original jurisdiction in this case.

{*18*} We also note that "mandamus is an appropriate means to prohibit unlawful or unconstitutional official action." *State ex rel. Clark,* 1995–NMSC–051, 120 N.M. at 570, 904 P.2d at 19. As our courts have held since territorial days, the authority to prohibit unlawful official conduct is implicit in the nature of mandamus. *See In re*

*Sloan*, 5 N.M. 590, 25 P. 930, *cited in State ex rel. Clark*, 1995–NMSC–051, 120 N.M. at 569–70, 904 P.2d at 18–19. New Mexico courts commonly use forms of prohibitory mandamus. *See State ex rel. Clark*, 1995–NMSC–051, 120 N.M. at 570, 904 P.2d at 19; *see also Stanley v. Raton Bd. of Educ.*, 117 N.M. 717, 718, 876 P.2d 232, 233 (1994); *State ex rel. Bird v. Apodaca*, 91 N.M. 279, 282, 573 P.2d 213, 216 (1977). Since Petitioners are alleging that the Respondents engaged in unlawful or unconstitutional official acts, Petitioners may request mandamus as the necessary relief.

### III.

{*19*} Next we address whether the Respondents' actions constituted a violation of the New Mexico Constitution's separation of powers provision. Respondents contend that implementation of Respondents' program does not unconstitutionally infringe upon the Legislature's authority. Instead, they argue first that, as agents of the executive branch, they may implement the policy changes without seeking the direct participation of the Legislature. Respondents also contend that the Legislature conferred discretionary authority upon HSD to construct plans, make rules, and enact all regulations necessary to secure federal public assistance funds and to comply with federal law. As part of this position, Respondents assert not only that they were given discretionary authority to make such adjustments, but also that New Mexico and federal law compelled them to make the policy changes. We disagree.

### A.

{*20*} Article III, Section 1 of the New Mexico Constitution prohibits any branch of government from usurping the power of the other branches:

> The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others. . . .

NM Const. art. III, § 1. This provision articulates one of the cornerstones of democratic government: that the accumulation of too much power within one branch poses a threat to liberty. *See Gregory v. Ashcroft*, 501 U.S. 452, 458–59, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991); *The Federalist* No. 47, at 332 (James Madison) (M. Walter Dunne 1901) (discussing Montesquieu).

{*21*} Within our constitutional system, each branch of government maintains its independent and distinct function. *See State v. Fifth Judicial Dist. Court*, 36 N.M. 151, 153, 9 P.2d 691, 692 (1932) (noting that "[t]he Legislature makes, the executive executes, and the judiciary construes the laws."). We have said that only the legislative branch is constitutionally established to create substantive law. *See State ex rel. Sofeico v. Heffernan*, 41 N.M. 219, 230–31, 67 P.2d 240, 246 (1936) (stating that the Legislature, rather than the State Game Commission, has the power to define what constitutes a game animal, because only the Legislature constitutionally "can create substantive law"); *State v. Armstrong*, 31 N.M. 220, 255, 243 P. 333, 347 (1924) (stating that the Legislature possesses the sole power of creating law). We also have recognized the unique position of the Legislature in creating and developing public policy. "[I]t is the particular domain of the legislature, as the voice of the people, to make public policy. Elected executive officials and executive agencies also make policy, [but] to a lesser extent, [and only] as authorized by the constitution or legislature." *Torres v. State*, 119 N.M. 609, 612, 894 P.2d 386, 389 (1995) (discussing the judiciary's role in determining the existence of a tort duty).

{*22*} A governor's proper role is the execution of the laws. NM Const. art. V, § 4. Public assistance programs must be administered, and we recognize that such administration involves discretion by executive agencies. Yet, such discretion is not boundless. Generally, the Legislature, not the administrative agency, declares the policy and establishes primary standards to which the agency must conform. *See State ex rel. State Park & Recreation Comm'n v. New Mexico State Authority*, 76 N.M. 1, 13, 411 P.2d 984, 993 (1966). The administrative

agency's discretion may not justify altering, modifying or extending the reach of a law created by the Legislature. *See, e.g., Chalamidas v. Environmental Improvement Div. (In re Proposed Revocation of Food and Drink Purveyor's Permit)*, 102 N.M. 63, 66, 691 P.2d 64, 67 (Ct.App.1984) (stating that an "agency cannot amend or enlarge its authority through rules and regulations"); *Rainbo Baking Co. v. Commissioner of Revenue*, 84 N.M. 303, 306, 502 P.2d 406, 409 (Ct.App. 1972).

{23} While recognizing the specific roles of each branch of government, we also note that absolute separation of powers is "neither desirable nor realistic," *State ex rel. Clark*, 1995–NMSC–051, 120 N.M. at 573, 904 P.2d at 22, and that the constitutional doctrine of separation of powers permits some overlap of governmental functions, *Mowrer v. Rusk*, 95 N.M. 48, 53, 618 P.2d 886, 891 (1980). Nonetheless, this Court must give effect to Article III, Section 1, and will not be reluctant to intervene where one branch of government unduly encroaches or interferes with the authority of another branch. *State ex rel. Clark*, 1995–NMSC–051, 120 N.M. at 573, 904 P.2d at 22; *Rusk*, 95 N.M. at 54, 618 P.2d at 892. Such an infringement occurs when the action by one branch prevents another branch from accomplishing its constitutionally assigned functions. *State ex rel. Clark*, 1995–NMSC–051, 120 N.M. at 574, 904 P.2d at 23 (citing *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 433, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977)).

{24} "The test is whether the Governor's action disrupts the proper balance between the executive and legislative branches." *State ex rel. Clark*, 1995–NMSC–051, 120 N.M. at 574, 904 P.2d at 23. If a governor's actions infringe upon "the essence of legislative authority—the making of laws—then the [g]overnor has exceeded his authority." *State ex rel. Clark*, 1995–NMSC–051, 120 N.M. at 573, 904 P.2d at 22. A violation occurs when the Executive, rather than the Legislature, determines "how, when, and for what purpose the public funds shall be applied in carrying on the government," *State ex rel. Schwartz v. Johnson*,

1995–NMSC–083, ¶ 14, 120 N.M. 820, 907 P.2d 1001 (quoting *State ex rel. Holmes v. State Bd. of Fin.*, 69 N.M. 430, 441, 367 P.2d 925, 933 (1961)). In addition, infringement upon legislative power may also occur where the executive does not "execute existing New Mexico statutory or case law [and rather attempts] to create new law ." *State ex rel. Clark*, 1995–NMSC–051, 120 N.M. at 573, 904 P.2d at 22.

B.

{25} We have no doubt that Respondents' program implements the type of substantive policy changes reserved to the Legislature. Their changes substantially altered, modified, and extended existing law governing the structure and provision of public assistance in New Mexico. *See Chalamidas* 102 N.M. at 66, 691 P.2d at 67; *Rainbo*, 84 N.M. at 306, 502 P.2d at 409. Furthermore, by refusing to permit legislative participation in fashioning public assistance policy changes, Respondents "attempt to foreclose legislative action in [an] area[ ] where legislative authority is undisputed." *State ex rel. Clark*, 1995–NMSC–05 120 N.M. at 574, 904 P.2d at 23. We hold that Respondents' program constitutes executive creation of substantive law, and as such, is an unconstitutional encroachment upon the Legislature's role of declaring public policy.

{26} The substantial nature of the Respondents' adjustments to public assistance policy are best illustrated: 1) by comparing existing New Mexico public assistance standards with Respondents' changes; and 2) by placing those changes in the context of the range of policy options available to the New Mexico Legislature.

{27} First, federal AFDC statutes required that a child be "dependent" to qualify for assistance. Generally, this meant that a child had to be from a one-parent household to be eligible for benefits. 42 U.S.C. § 606(a). The PRA eliminated this federal requirement and gave the states the option to use TANF funds to support needy children in two-parent families as well. Pub.L. 104–193, § 103, 110 Stat. 2105, 2113 (Sec. 401(a)(4)), 2134 (Sec.408(a)(1)(A)). Although

New Mexico had the option under federal law to maintain its existing "dependent" requirement, Respondents eliminated the requirement in New Mexico through the new administrative regulations. Income Support Division Financial Assistance Program, NM Human Serv. Dep't, 8 NMAC 3.FAP.407 (July 1, 1997). Respondents' actions effectively denied the Legislature any participation in this decision.

{28} Second, the old federal AFDC program contained ancillary job training and limited work requirements. *See* Pub.L. 104–193, § 103, 110 Stat. 2105, 2133 (Sec.407(e)). New Mexico's current law reflects this. NMSA 1978, § 27–2–6.2 (1988). The PRA replaced these programs with mandatory work requirements. *Id.* Respondents' program imposed a mandatory work requirement through regulations and adopted work schedules that exceed those included in the PRA. 8 NMAC 3.FAP.415.3 and 415.5 (July 1, 1997). Again, the Legislature had no participation in deciding the extent of work requirements appropriate for New Mexico.

{29} Third, under the old federal framework, eligible individuals were deemed "entitled"to benefits. This meant that states were not free to make waiting lists or establish limits on the duration of assistance. The new PRA permits states to limit or end this entitlement. Pub.L. 104–193, § 103, 110 Stat. 2105, 2113 (Sec.401(b)). Respondents' program eliminated the entitlement in New Mexico. 8 NMAC 3.FAP.419 (July 1, 1997). The Legislature had no influence in deciding, as a matter of public assistance policy, whether an entitlement should have been maintained in New Mexico.

{30} Finally, federal AFDC did not impose any durational limits on eligibility for benefits. However, according to the PRA, states cannot use TANF block grant money to provide assistance to persons for more than five years. Pub.L. 104–193, § 103, 110 Stat. 2105, 2137 (Sec.408(a)(7)(A)). Hence, if a state chooses, it may provide assistance without durational limits, but public assistance payments exceeding five years must be funded entirely by state coffers. Pub.L.

104–193, § 103, 110 Stat. 2105, 2138 (Sec. 408(a)(7)(F)). Respondents' program set a durational limit of three years in New Mexico. 8 NMAC 3.FAP.419 (July 1, 1997). The Legislature, had it been given the option, might have chosen not to impose a durational limit. Or alternatively, it might have chosen to set a limit of shorter or longer duration. Promulgation of the new program's three year limitation denied the Legislature any participation in deciding what, if any, time limits would be appropriate for New Mexico.

{31} Although this is not a complete list of the changes affected by Respondents' regulations, these examples represent a substantial change in New Mexico's public assistance eligibility or delivery standards without the participation of the Legislature. Indeed, little of New Mexico's public assistance program remains intact in the wake of Respondents' changes. Such results, by their very nature, set fundamental standards and make vital policy choices, a role reserved for the Legislature. See NM Const. art. IV, § 1; *State ex rel. Sofeico,* 41 N.M. at 230–31, 67 P.2d at 246; *Armstrong,* 31 N.M. at 255, 243 P. at 347.

{32} We also believe that the past practices of the New Mexico Legislature and Executive are instructive on these issues. In the past, when states were given the option to adopt federal public assistance policy changes, such changes were examined and adopted through the full legislative process and eventually signed into law by a governor. *See, e.g.,* NMSA 1978, § 27–2–10 (authorizing a food stamp program to carry out the federal Food Stamp Act and associated regulation); NMSA 1978, § 27–2–12 (authorizing the medical assistance division to provide medical assistance by regulation); NMSA 1978, § 27–2–6.2(A) (limiting employment and training requirements in programs established or conducted by the Human Services Department). Thus, the Respondents' unilateral implementation of the public assistance changes represents a substantial break with past practice, ignoring the New Mexico Legislature's consistent role in creating state public assistance policy.

{33} In sum, when the federal government enacted the PRA, New Mexico faced

three questions: 1) whether to continue to use the state's existing public assistance framework; 2) whether to create a new program for the delivery of public assistance services, and if so, the identification of its essential structure and elements; and 3) whether to administer a program with federal funding which would be subject to new federal restrictions. These issues go to the core of public assistance policy. By implementing their plan through HSD regulations rather than through the required legislative process, Respondents made these core policy choices themselves, thereby preventing the constitutionally required input of the people's elected law-making representatives.

### C.

{*34*} The NMPAA does not confer upon Respondents discretionary authority to implement the PROGRESS program changes. Respondents cite to eight primary sections of the NMPAA that they contend confer discretionary authority upon HSD.[4] As a general matter, Respondents make much of the language calling for "consistency with federal law" included in some of these cited sections. Respondents argue that this language indicates that the New Mexico Legislature has delegated expansive authority to HSD to promulgate any necessary regulations which will maintain conformity between New Mexico and federal public assistance law. We disagree.

{*35*} Taken as a whole, these references to consistency merely recognize that HSD acts with the federal government to cooperatively administer certain public assistance programs such as AFDC and Medicaid. Such "boilerplate" language recognizing the cooperative nature of the federal and state relationship. cannot be used to justify the unfettered discretionary authority that Respondents urge. Nor can this language be used to ignore the substantive commands of the New Mexico Legislature.

{*36*} The language invoked by Respondents is a limitation on HSD, not a *carte blanche* grant of discretionary authority. The language indicates that where joint federal/state programs are involved, New Mexico's regulation of the programs cannot violate federal guidelines. The phrases "must be consistent" or "as required by federal law" by their very nature suggest that, even though the programs are administered jointly, there are aspects of the programs that are regulated solely by federal law. The states are at liberty to determine some elements of the subject programs, but state power is limited in that the states cannot contradict federal controls over a program. Viewed in this context, we have no doubt that the "consistency" language is a limitation on HSD discretion and not a delegation of legislative power.

{*37*} This Court used similar "consistency" language in *Katz v. New Mexico Depart-*

4. The cited sections include:
NMSA 1978, § 27–1–3(D) (1937), which states that HSD may "formulate detailed plans, make rules and regulations and take action deemed necessary and desirable to carry out the provision of Chapter 27 NMSA1978 and which is not inconsistent with the provisions of that Chapter."
NMSA 1978, § 27–1–3(J) (1937), which authorizes HSD to "administer such other public welfare functions as may be assumed by the state after the effective date of the section;"
NMSA 1978, § 27–2–3 (1975), which requires that, "[c]onsistent with the federal act and subject to the availability of federal and state funds," HSD will set a standard of need which establishes "a reasonable level of subsistence;"
NMSA 1978, § 27–2–4 (1975), which sets out five specific conditions for public assistance eligibility. The section begins, "Consistent with the federal act, a person is eligible for public assistance grants under the Public Assistance Act if ...;"

NMSA 1978, § 27–2–5 (1982), which sets forth the methodology for determining the amount of grants, permitting across the board reductions, "as necessary," should the amount of federal and state funds be insufficient to provide maximum grants for all eligible persons;
NMSA 1978, § 27–2–10 (1973), which authorizes HSD to establish a food stamp program in New Mexico subject to the continuation of the federal program and availability of federal funds;
NMSA 1978, § 27–2–15 (1937), which designates HSD as the state agency that will cooperate with the federal government in the administration of the federal Social Security Act;
NMSA 1978, § 27–2–16 (1984), which authorizes HSD to administer programs for the aged, blind, and disabled in the "amounts consistent with federal law to enable the state to be eligible for Medicaid funding."

ment of Human Services, *95 N.M. 530, 624 P.2d 39 (1981). We stated in* Katz *that:*

Compliance with the federal requirements is a condition to the receipt of federal funds. Section 27–2–12, N.M.S.A.1978, therefore requires that [HSD] must operate the [Medicaid] program *consistent with the federal act.*

*Id.* at 532, 624 P.2d at 41 (emphasis added). Respondents contend that this language supports their argument that HSD has broad discretionary authority to do whatever is necessary to conform New Mexico's public assistance programs to federal guidelines. We disagree.

{*38*}  In *Katz,* a patient applied to the New Mexico Human Services Department seeking Medicaid coverage for medical treatment rendered by a chiropractor and a physical therapist. *Id.* at 531, 624 P.2d at 40. The patient appealed HSD's denial of Medicaid funding for her treatment arguing that state and federal regulations required that HSD pay for the services. *Id.*

{*39*}  Analyzing first the federal statutes governing Medicaid, this Court ruled that "payment of services of chiropractors and physical therapists under the Medicaid program is optional [by the states] and not mandated by federal law . . . ." *Id.* at 532, 624 P.2d at 41. The Court then turned to an analysis of New Mexico regulations to determine whether New Mexico had opted to cover such services. *Id.* It concluded that New Mexico regulations did not cover them. *Id.* Thus, according to state and federal law, HSD was not required to pay for the chiropractic services and physical therapy received by the claimant.

{*40*}  Contrary to Respondents' assertion, *Katz* was not decided as a matter of HSD discretionary authority. The claimant's arguments were rejected because federal and state law did not list or provide for payment of chiropractic services and physical therapy.

If anything, *Katz* stands for the proposition that HSD discretion is strictly limited by the state and federal statutes and regulations which govern Medicaid services. Thus, Respondents' arguments with regard to *Katz* are without merit.

{*41*}  Respondents also assert that, aside from the provisions referring to consistency with federal law, other NMPAA provisions empower them with the discretionary authority to implement the new regulations.[5] However, the NMPAA contains significant evidence of a legislative intent to limit HSD's authority. Section 27–2–4 lists specific eligibility requirements and appears to be an exclusive listing. Within that provision, subsection 27–2–4(C) states that a benefits recipient must "meet all qualifications for *one of the public assistance programs authorized by the Public Assistance Act.*" (emphasis added). The NMPAA only authorizes the implementation of four programs: AFDC, Medicaid, the General Assistance Program, and the Food Stamp Program. In addition, the Legislature specifically directs that HSD not act "inconsistent with the provisions" of the NMPAA. Section 27–1–3(D). Given the general principles that the Legislature is the policy-making body, that it may create agencies to carry out legislative initiatives, and that, in creating an agency, it sets boundaries for the agency's exercise of the authority granted by the Legislature, we conclude that, in its efforts to cooperate with federal authorities, HSD has no mandate to ignore existing New Mexico statutes. In the present circumstances, the NMPAA constrains, rather than enlarges, HSD's authority.

{*42*}  In addition, we reject any notion that the PRA confers authority upon the executive branch to ignore duly enacted state legislation or to make the legislative policy choices embodied in the new public assistance changes. The PRA confers upon the states the essential choices of public as-

---

5.  These provisions, in short, give HSD authority: 1) to adopt, amend and repeal bylaws, rules, and regulations, Section 27–1–2(E); 2) to establish, extend and strengthen public assistance programs for children, Section 27–1–2(L); 3) to establish and administer a program for relief, Section 27–1–2(M); 4) to formulate detailed plans, make rules and regulations and take action deemed necessary or desirable to carry out the provisions of [the NMPAA], Section 27–1–3(D); 5) to cooperate with the federal government in matters of mutual concern pertaining to public assistance, Section 27–1–3(E); and 6) to administer such other public assistance functions as may be assumed by the state after the effective date of this section, Section 27–1–3(J).

sistance policy. Pub.L. 104–193, § 103, 110 Stat. 2105, 2113 (Sec.401(a)(I)), 2124 (Sec. 404(a)), 2138 (Sec.408(a)(7)(E), (F)). The PRA neither explicitly or implicitly gives that authority solely to the executive of the state. Furthermore, federal law cannot enlarge state executive power beyond that conferred by the state constitution. *State ex rel. Clark,* 1995–NMSC–051, 120 N.M. at 577, 904 P.2d at 26 (finding an identical argument by the Governor to be "inconsistent with core principles of federalism"); *cf. New York v. United States,* 505 U.S. at 176, 112 S.Ct. 2408 (striking act of Congress requiring states to act).

{*43*} In a similar vein, Respondents also argue that the PRA imposes conditions on New Mexico and that the Legislature's acceptance of TANF funds, absent required changes in the NMPAA, leaves the implementation of those obligatory changes to the Executive. It is true that "under Congress' spending power, 'Congress may attach conditions on the receipt of federal funds.'" *New York v. United States,* 505 U.S. 144, 167, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (quoting *South Dakota v. Dole,* 483 U.S. 203, 206, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987)). However, as indicated above, we conclude that many provisions contained in Respondent's program were not required by the PRA.

{*44*} Finally, we reject Respondents' contention that if the Legislature disagrees with Respondents' program, the appropriate remedy is for the Legislature to redirect HSD's discretionary authority with new statutes during the next legislative session. This argument has no merit. Only a simple majority is required to pass a bill through both legislative chambers. NM Const. art. IV, § 17. A governor is constitutionally entitled to veto the legislation if he does not agree with it. NM Const. art. IV, § 22. The Legislature then has the option of attempting to override the veto, by securing a two-thirds majority. *Id.* The counterbalance of a governor's veto power against the Legislature's ability to override the veto is the mechanism that forces the two branches to compromise and work together to create law.

{*45*} The alleged remedy that Respondents' urge is impractical, and more importantly, it would subvert the system of checks and balances of the New Mexico Constitution. Through HSD regulation, Governor Johnson implemented new public assistance policies in exactly the form that he deemed appropriate for New Mexico. If the Legislature were now to pass statutory amendments by a simple majority in an attempt to "redirect" HSD's discretion, the Governor's signature would still be required for such changes to become law.

{*46*} Respondents' position is impractical because the Governor would have no reason to accept, or even consider, such changes. He already has the public assistance policies in place that he favors via administrative regulation. Therefore, no incentive exists for him to consider any public assistance changes suggested by the Legislature. Consequently, the Governor could, and almost certainly would, veto any bill submitted to him altering the program that he already put in place unilaterally.

{*47*} With the administrative changes to public assistance already in place and a veto of any proposed amendments assured, the Legislature could convince the Governor to compromise only if, from the outset, the Legislature had the necessary votes for a veto-override. This scenario, in effect, would force the Legislature to garner a veto-override majority of two-thirds to bring about any consideration of amendments to the existing public assistance regulations.

{*48*} Respondents' recommendation for further legislative action turns our constitutional system of checks and balances on its head. The New Mexico Constitution requires that the Legislature first have the opportunity to debate and vote on core policy changes; only then may the Governor exercise his veto powers and force the Legislature to consider a veto-override. In this case, the Governor already has usurped the legislative function, initiating public policy changes which should find their genesis only in the Legislature. Requiring legislative action to change the Governor's program now would place the Legislature in a position of responding to, rather than initiating, core public policy choices.

### D.

{*49*} Because the substantive public assistance policy changes promulgated in Respondents' plan required legislative participation and because neither state statute nor federal law conferred discretionary authority upon Respondents to institute the policy changes, we conclude that Respondents violated Article III, Section 1 of the New Mexico Constitution. From this conclusion, a writ of mandamus was issued September 10, 1997.

### IV.

{*50*} In the months that followed the Writ, Respondents made no attempt to comply with the Writ and openly defied this Court. During this time, Respondents were advised by several legal authorities that they should comply with this Court's Writ. The New Mexico Attorney General assured Respondents that no irreconcilable conflicts existed between state and federal law and stressed the importance of relinquishing the Respondents' public assistance program. HSD's general counsel also advised Respondents to return to New Mexico's existing program until the Legislature passed a bill and the Governor signed it into law. Despite this overwhelming advice to comply with the Court's Order, Respondents continued implementation of their public assistance program.

{*51*} After several failed attempts to seek Respondents' compliance, Petitioners filed a Motion for Supplemental and Further Relief. Respondents did not deny that they were disobeying the Court's Writ. Respondents admitted that the Writ compelled them to cease their public assistance program and reinstate New Mexico's existing program. However, HSD continued to encourage implementation of Respondents' new public assistance regulations, except with respect to a waiver of the work requirement penalty.

{*52*} On October 24, 1997, Petitioners filed a motion to have this Court declare Respondents in contempt of court. The petition alleged that Respondents continued to carry out their public assistance program. Respondents replied that they could not comply with the Court's Writ because the existing state statutes were contrary to federal PRA guidelines. Specifically, Respondents asserted that state statutes: 1) provided benefits to unqualified aliens, felons, and parole violators, and 2) did not include mandatory work requirements.

{*53*} Before considering contempt proceedings, the Chief Justice strongly encouraged the parties to engage in good-faith negotiations or mediation toward settlement. Despite the Chief Justice's encouragement, Respondents refused to consider any proposals, and they continued to implement their own public assistance program.

{*54*} On December 8, 1997, the Petitioners filed a Supplemental Memorandum concerning possible sanctions and urged the Court to consider imposing contempt sanctions against both the Governor, and newly-appointed HSD Secretary Bill Johnson. In response, Respondents only repeated the argument that they could not comply with the Court's Writ because NMPAA conflicted with federal law. Pursuant to motion, the Court then initiated contempt proceedings, setting a hearing for Respondents to show cause why they should not be held in contempt.

{*55*} At the contempt hearing, Respondents maintained that harmonizing the Court's Writ with the federal funding requirements in the PRA was impossible. Respondents reasoned that because the federal government no longer funds the federal AFDC program, HSD was unable to return to the existing New Mexico law. Respondents also asserted that the state would lose federal public assistance funds as a result of complying with the Court's Writ.

{*56*} Respondent's misrepresentation of the loss of federal funding was an attempt to mislead this Court. Respondents first asserted that reinstituting the prior AFDC program would result in the loss of the entire amount of federal welfare funding. Yet, the actual penalty for noncompliance with the PRA's requirements and penalties would be a loss of no more than 5% of the entire federal funding amount. Federal Register Vol. 62, No. 224, Nov. 20, 1997. Although this may be a substantial amount, it would not be the death knell for the state's welfare program that Respondents would have us

believe. Second, Respondents suggested that New Mexico would suffer immediate funding consequences if they followed the Court's Writ. However, existing federal authority indicates that if any federal funds were going to be withheld from New Mexico, such a decision would not be made anytime in the near future. *Id.* Hence, the tone of urgency and desperation adopted by Respondents was at best unnecessary, and at worst, misleading. Third, contrary to Respondents' assertions, nothing in the record indicates that anyone from either HSD or the Governor's Office made any inquiries with federal agencies regarding the imposition of possible penalties or exceptions. We are not convinced that Respondents actually pursued this avenue as a possible solution to this case. Finally, Respondents' counsel misused legal authority in an attempt to mislead this Court. During oral argument, Respondents' counsel cited to a proposed rule, treating it as applicable federal law. We specifically object to this misrepresentation and to counsel's attempt to lead this Court astray.

{57} FAIR, the Legislature's proposed public assistance program that the Governor vetoed, may not have been acceptable to the Governor, but it did comply with the PRA. The Governor has every right to veto legislation but he must be mindful of his veto's consequences. The Governor should have foreseen that vetoing the proposed public assistance program left the prior AFDC program as the only viable public assistance program. Implementing Respondents' own welfare program without legislative approval was not an option.

## V.

{58} Next we address application of the appropriate contempt sanction. "Without question, the power of the judiciary to compel compliance with its orders, extends to the executive branch." *Westefield v. IRS,* 172 B.R. 178, 179–80 (Bankr.W.D.N.Y.1994) (quoting *McBride v. Coleman,* 955 F.2d 571, 581–82 (8th Cir.1992) (Lay, J. concurring in part, dissenting in part)). "The executive branch of government has no right to treat with impunity the valid orders of the judicial branch." *Nelson v. Steiner,* 279 F.2d 944,

948 (7th Cir.1960) (*quoted in McBride,* 955 F.2d at 582 (Lay, J. concurring in part, dissenting in part)).

{59} By statute, the New Mexico Supreme Court has the authority to hold an individual in contempt of court and to punish, by "reprimand, arrest, fine or imprisonment." NMSA 1978, § 34–1–2 (1929). In determining the appropriate punishment for civil contempt, the Court exercises its discretion. The Court considers the character and degree of harm threatened by continued contemptuous acts and whether contemplated sanctions will cause compliance with the Court's order. *State v. Pothier,* 104 N.M. 363, 369, 721 P.2d 1294, 1300 (1986). Courts consider the seriousness of the consequences of continued contemptuous behavior, the public's interest in ending defendants' defiance, and the importance of avoiding future defiance. *Case v. State,* 103 N.M. 501, 502, 709 P.2d 670, 671 (1985).

{60} A court may directly order an individual to comply with its order to purge himself or herself of contempt and may stay further sanctions if the individual complies with the order by a specified date. *See State ex rel. Dep't Corrections v. Pena,* 911 P.2d 48, 55 (Colo.1996) (en banc) (affirming a contempt order against an executive director and administrative officer of the Department of Corrections that had awarded damages to the party moving for contempt). Other state courts have used direct orders or injunctions to compel executive branch members to comply with court orders. *See Whitehead v. Nevada Comm'n on Judicial Discipline,* 110 Nev. 128, 906 P.2d 230, 236–37 (1994) (holding attorney general's action in counseling others to defy a court order proper subject of contempt proceedings but electing to defer adjudication until such time as the advisees, having been fully informed, continue to resist court order).

{61} Some state courts have fined executive branch members in their individual capacities when their actions were willful and performed in bad faith. *E.g., Ross v. Superior Court,* 19 Cal.3d 899, 141 Cal.Rptr. 133, 569 P.2d 727, 738 (1977) (en banc) (affirming trial court decision holding members of board

of supervisors individually in contempt of court and imposing a fine on each member); *but see United Mine Workers v. Faerber*, 179 W.Va. 77, 365 S.E.2d 357, 359–60 (1987) (denying motion to impose damages award for contempt against an executive officer in his personal capacity due to the absence of malice or a willful, knowing disobedience of court order, relying on two cases, *Class v. Norton*, 505 F.2d 123, 127–28 (2d Cir.1974); *Woolfolk v. Brown*, 358 F.Supp. 524, 537 (E.D.Va.1973) (involving state welfare officials; violation of court orders)); *In re S.C.*, 802 P.2d 1101, 1103–04 (Colo.Ct.App.1989) (holding juvenile court properly found four Colorado Department of Institutions officials in contempt of court for refusing to accept a juvenile committed to a receiving center and did not abuse its discretion in imposing fines as a sanction). Individual executive branch members have had to pay personal contempt fines when the individual has notice of the judgment and is able to comply with the court order and nonetheless refuses to comply with the judgment. *Ross*, 141 Cal.Rptr. 133, 569 P.2d at 730. Some states also have restricted an individual member from using certain state funds to pay the fine. *See Id.*

{62} Courts may also impose imprisonment in a civil contempt action to coerce compliance. *See State ex rel. Dept. of Human Servs. v. Rael*, 97 N.M. 640, 642, 642 P.2d 1099, 1101 (1982); *Niemyjski v. Niemyjski*, 98 N.M. 176, 177, 646 P.2d 1240, 1241 (1982). It is clear this Court has authority to implement the full extent of contempt sanctions against executive branch members, including fines and imprisonment.

{63} Petitioners urge this Court to consider appointing a special master to oversee the program and to ensure compliance. Under Petitioners' proposal, the special master would recommend to this Court the appropriate sanction. Petitioners suggest that if Respondents continue to refuse to comply with the Writ, then this Court could expand the special master's authority, assigning the special master to administer the entire public assistance program. However, we do not feel that such an appointment is appropriate.

{64} We hold that the most appropriate contempt sanction is an order directing Respondents to cease and desist immediately from implementing the Respondents' public assistance program within seven days. The Court will consider imposing further sanctions if Respondents do not comply. Here, the Court's Writ requires Respondents to stop implementing an unconstitutional program. Respondents do not have the discretion to continue an unconstitutional act. Moreover, Respondents had more than adequate notice and were advised to comply with the Writ.

{65} We hold that Respondents acted in defiance of this Court's Order and have shown no justification for failing to comply with it. Accordingly, we find Respondents in indirect civil contempt, and after reviewing all sanctions within our contempt power, we hold that the most appropriate sanction is a direct order to comply within a specified time, with further sanctions if Respondents do not immediately comply. We maintain jurisdiction to impose additional contempt sanctions if we later determine that they are necessary and appropriate.

{66} **IT IS SO ORDERED.**

FRANCHINI, C.J., and MINZNER, SERNA and McKINNON, JJ., concur.

