## In re INTERROGATORIES SUBMITTED BY the GENERAL ASSEMBLY ON HOUSE BILL 04–1098.

### No. 04SA64.

Supreme Court of Colorado.

April 19, 2004.

Office of Legislative Legal Services, Charles W. Pike, Dan L. Cartin, Sharon L. Eubanks, Isaacson, Rosenbaum Woods, & Levy, P.C., Mark G. Grueskin, Denver, CO, Attorneys for the General Assembly.

Cynthia Honssinger, Chief Counsel to the Governor, Gwen Benevento, Deputy Counsel to the Governor Denver, Colorado, and Ken Salazar, Attorney General, Kenny Fagan, Deputy Attorney General, Denver, Colorado, Attorneys for Governor Owens.

Justice RICE delivered the Opinion of the Court.

Pursuant to section 3 of Article VI of the Colorado Constitution, the General Assembly has submitted to this court two interrogatories regarding House Bill 04–1098. The interrogatories are:

*Interrogatory No. One:*

Do the elements specified in House Bill 04–1098 that define "custodial moneys" comport with principles of separation of powers under Article III of the state constitution, the legislative power of appropriation under sections 32 and 33 of Article V of the state constitution, and the precedent of the Supreme Court construing such powers?

*Interrogatory No. Two:*

Can House Bill 04–1098 constitutionally exclude from the definition of "custodial moneys" any moneys granted by the federal government to Colorado for the support of general or essential state government services of the type for which expenditures are made in the most recently approved annual general appropriation act, including but not limited to additional payments received by the state under the "Jobs and Growth Tax Relief Reconciliation Act of 2003"?

We decline to answer the first interrogatory because the nature of federal grant moneys, and specifically whether they constitute custodial funds, must be determined on a case-by-case basis with due consideration given to all of the relevant circumstances. As such, we cannot determine at this time whether the definition of "custodial moneys" as provided in House Bill 04–1098 will be adequate for evaluating future grant moneys, which may be disbursed in a manner not yet addressed by this court.

We answer the second interrogatory in the affirmative. Moneys granted by the federal government to Colorado for the support of general or essential state government services, such as those allocated under the federal Jobs and Growth Tax Relief Reconciliation Act of 2003 (the "Jobs Act" or the "Act"), 42 U.S.C. § 801 *et seq.* (2004), are not custodial funds. Thus, the General Assembly constitutionally excluded such funds from the definition of "custodial moneys" in House Bill 04–1098.

**I. Facts**

On May 28, 2003, President George W. Bush signed into law the Jobs Act. In addition to providing various tax cuts and credits,

the Act allocated ten billion dollars in fiscal relief to the states. 42 U.S.C. § 801(a). The Act sets forth certain minimal restrictions on the use of those state relief funds in section 801, requiring that the funds be used only to "provide essential government services" or to cover the costs of unfunded federal mandates. *Id.* § 801(d)(1).[1] The Act further provides that "[a] State may only use funds provided under a payment made under this section for types of expenditures permitted under the most recently approved budget for the State." *Id.* § 801(d)(2). Finally, the Act requires each state to certify to the Secretary of the Treasury that the "State's proposed uses of the funds are consistent with subsection (d)." *Id.* § 801(e). Beyond these limited requirements, the Act provides no guidance as to how each state should spend the money allotted, nor as to what appropriations process should be followed in making such decisions.

Pursuant to the Act, on June 12, 2003, Governor Owens signed and filed with the Treasury Secretary the required certification form, which set forth the state's intent to comply with the very broad requirements listed above in terms mirroring the language of the Jobs Act. Subsequently, the federal government disbursed to Colorado $73.2 million on June 23, 2003, and $73.2 million again on October 7, 2003. Throughout the summer of 2003, Governor Owens communicated, through both press releases and letters from Dr. Nancy McCallin, the Director of the Office of State Planning and Budgeting, to Senator Dave Owen, Chairman of the Joint Budget Committee, his intent to set aside the majority of the funds as a reserve for "future budget shortfalls." Additionally, over this period, the Governor allocated approximately $36.4 million of the funds to various programs with budget shortfalls and certain one-time capital projects.

In September 2003, Senator Owen sent a letter to Dr. McCallin expressing the General Assembly's concern that the funds received pursuant to the Act were subject to the General Assembly's plenary power of appropriation and questioning whether the Governor had any legal basis for spending the funds. In support of the Assembly's position, Senator Owen cited a legal opinion provided to the General Assembly by the Office of Legislative Legal Services. The opinion stated that the "extensive flexibility given the state to allocate the funds for a broad, rather than particularized purpose," precluded a finding that the funds were custodial in nature. Thus, because the Governor may exercise control only over "custodial funds,"[2] the legal opinion concluded that the Governor had no authority to spend the funds provided under the Jobs Act.

In response to Senator Owen's letter, the Governor requested an opinion from the Attorney General regarding the Governor's authority to spend the funds received under the Act. The Attorney General found that because the "Act specifies the purpose the State is directed to accomplish and places some restrictions on the use of the federal funds," the funds received under the Act are in fact custodial in nature. Consequently, the Attorney General concluded that the funds "can be expended based on the Governor's directive," rather than through the legislative appropriation process.

In January 2004, due to this conflict regarding the Jobs Act funds, members of the Joint Budget Committee introduced House

---

1. Notably, the original Senate amendment providing fiscal relief to states listed specific programs and activities that the funds should serve, including education or job training, health care, transportation or infrastructure, law enforcement or public safety, and other essential government services. H.R. Conf. Rep. No. 108–126, at 168 (2003). The amendment emerged from conference, however, in a much less specific form, directing states to use the funds for the more general purpose of "essential government services." *Id.*

2. As will be discussed in greater detail below, we have previously defined "custodial funds" as those "funds not generated by tax revenues which are given to the state for particular purposes and of which the state is a custodian or trustee to carry out the purposes for which the sums have been provided." *Colo. Gen. Assemb. v. Lamm,* 700 P.2d 508, 524 (Colo.1985) [hereinafter *Lamm I].* The issue of whether funds are deemed custodial is crucial to today's decision, as it is the executive, not the legislative branch, that retains control over custodial funds. *See MacManus v. Love,* 179 Colo. 218, 222, 499 P.2d 609, 610 (1972).

Bill 04–1098, defining "custodial moneys," which are exempt from the General Assembly's appropriation power, and expressly excluding certain types of revenue from the definition of "custodial moneys."[3] Specifically, House Bill 04–1098 defines "custodial moneys" as:

[M]oneys received by the Governor or by a department or agency of the state of Colorado: (I) That originated from a source other than the state; (II) That are awarded or otherwise provided to the state for a particular purpose, including, but not limited to, a specified program or function; (III) That contain restrictions on or defined standards for the use of the moneys or the use of which is subject to the approval of an authority or government other than the state, including, but not limited to, the federal government; and (IV) For which the state is acting as a custodian or trustee to carry out the particular purpose, program, or function for which the moneys have been provided.

H.B. 04–1098 at § (3)(a).

Additionally, the Bill excludes from the definition of "custodial moneys" the following:

Moneys granted by the federal government to the state that are subject to allocation by the state for the support of general or essential state government services of the type for which expenditures are made in the most recently approved annual general appropriation act, including, but not limited to, federal relief payments under the federal "Jobs and Growth Tax Reconciliation Act of 2003", as amended, (P.L. No. 108–27), received by the state on or after the effective date of this subsection (3).

H.B. 04–1098 at § (3)(b)(III). Thus, the General Assembly tracked the pertinent language of the federal Jobs Act in excluding certain funds from the definition of "custodial moneys."

At issue before us today is the language of the above two sections of House Bill 04–1098.

In particular, we have been asked to determine whether the General Assembly may constitutionally exclude from the definition of "custodial moneys" funds such as those granted by the federal government under the Jobs Act and whether the General Assembly's definition of "custodial moneys" in House Bill 04–1098 comports with principles of separation of powers as enumerated in the Colorado constitution and analyzed throughout our case law.

We find that the General Assembly may constitutionally exclude from the definition of "custodial moneys" funds distributed in the future pursuant to the Jobs Act or funds obtained from the federal government under similar circumstances. Moneys granted by the federal government to Colorado for the support of general or essential state government services, such as those allocated under the Jobs Act, are not custodial funds. As such, we answer the second interrogatory in the affirmative.

However, we decline to reach the issue of whether House Bill 04–1098 constitutionally defines "custodial moneys." The nature of federal grant moneys, and specifically whether they constitute custodial funds, must be determined on a case-by-case basis with due consideration given to all of the relevant circumstances. Thus, we cannot determine at this time whether the definition of "custodial moneys" as provided in House Bill 04–1098 will be adequate for evaluating future grant moneys, which may be disbursed in a manner not yet addressed by this court.

## II. Applicable Law

We begin our analysis with the doctrine of separation of powers, as set forth in Colorado's constitution:

The powers of the government of this state are divided into three distinct departments,—the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments

---

**3.** The bill as first introduced applied to federal moneys that had already been received by Colorado under the Jobs Act in 2003. The House Finance Committee later responded to the Governor's opposition to the bill by amending the language to specify that this exclusion applies only prospectively.

shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted.

Colo. Const. art. III. We have previously recognized that while this concept appears fairly simple, "[t]he dividing lines between the respective powers are often in crepuscular zones, and, therefore, delineation thereof usually should be on a case-by-case basis." *MacManus v. Love*, 179 Colo. 218, 221, 499 P.2d 609, 610 (1972).

■ The distinction between what constitutes a legislative as opposed to an executive power becomes particularly problematic when addressing the spending powers of the respective branches. *See, e.g., Lamm I*, 700 P.2d at 519 (noting that "[w]hen confronted by the necessity of exploring this twilight zone of competing constitutional authority, courts must measure the extent of the Governor's authority to administer by the extent of the General Assembly's power to appropriate"). While the General Assembly holds plenary power to appropriate state funds, subject only to constitutional limitations, the executive branch has the authority to administer those funds once appropriated. *See, e.g., Colo. Gen. Assemb. v. Lamm*, 704 P.2d 1371, 1380 (Colo.1985) [hereinafter *Lamm II*] (holding that the General Assembly's imposition of restrictions on revenue sources for its appropriations did not violate separation of powers); *see also* Colo. Const. art. V, § 32 (directing the General Assembly to issue an appropriation bill to cover the expenses of the executive, legislative, and judicial departments); Colo. Const. art. V, § 33 ("No moneys in the state treasury shall be disbursed therefrom by the treasurer except upon appropriations made by law, or otherwise authorized by law. . . ."); Colo. Const. art. IV, § 2 (providing that the executive branch must "take care that the laws be faithfully executed"). Thus, disputes over the control of funds frequently present separation of powers issues.

■ Importantly, the General Assembly's plenary power over appropriations applies only to "state moneys," while the Governor retains control over those funds deemed custodial in nature. *See MacManus*, 179 Colo. at 222, 499 P.2d at 610; *Colo. General Assemb. v. Lamm*, 738 P.2d 1156, 1170–73 (Colo.1987) [hereinafter *Lamm III*] (addressing whether various forms of federal grants constituted custodial funds subject to the Governor's authority). Consequently, when addressing whether certain moneys fall under the powers of the legislative or executive branch, the primary question we are called to answer is whether those moneys constitute general state funds or custodial funds. A review of our previous cases provides some guidance as to the factors which are relevant in answering that question.

■ In *MacManus*, we addressed the constitutionality of a provision in the Long Bill [4] which required state agencies to obtain prior legislative approval before spending any federal funds. 179 Colo. at 220, 499 P.2d at 610. While we recognized that the General Assembly had plenary power over appropriating state funds, we noted that custodial funds received from the federal government were not state moneys. *Id.* at 222, 499 P.2d at 610. As such, we found that the General Assembly's "attempt to limit the executive branch in its administration of federal funds to be received by the executive branch directly from agencies of the federal government and unconnected with any state appropriations" violated the doctrine of separation of powers. *Id.* at 221, 499 P.2d at 610.

Later, in *Anderson v. Lamm*, we addressed provisions in the Long Bill which provided for the adjustment of state funding appropriated for certain programs based on any excess or shortfall in federal funding provided for those same programs. 195

---

**4.** The term "Long Bill" is commonly used to refer to the general appropriation bill passed by the General Assembly pursuant to its plenary appropriation power under Colorado's constitution. *See Lamm I*, 700 P.2d at 523; *see also* Colo. Const. art. V, § 32 ("The general appropriation bill shall embrace nothing but appropria-

tions for the expense of the executive, legislative and judicial departments of the state, state institutions, interest on the public debt and for public schools. All other appropriations shall be made by separate bills, each embracing but one subject.")

Colo. 437, 443, 579 P.2d 620, 624–25 (1978). In upholding the Long Bill's provisions as not violative of the separation of powers doctrine, we noted that the General Assembly was adjusting the level of state, not federal, funding and, as such, was not "limit[ing] the executive branch in its staffing, resource allocation, or general administration of the federal funds it receives." *Id.* at 444, 579 P.2d at 625.

In *Lamm I*, we further clarified the distinction between legislative and executive powers in the appropriation process. 700 P.2d at 510. There, we addressed the Governor's interdepartmental transfers of state funds previously appropriated by the General Assembly to specific departments, as well as the Governor's allocation of payments from the Chevron Corporation to the state based on a federal consent order. *Id.* at 510–13. We first rejected the Governor's argument that he possessed an "inherent executive authority" to make the interdepartmental transfers. *Id.* at 519. Rather, we found that the Governor's actions violated the separation of powers doctrine because "the transfers ... dramatically altered the objectives which the General Assembly had determined were to be achieved through the use of state moneys," and, therefore, "impermissibly infringed upon the General Assembly's plenary power of appropriation." *Id.* at 521–22.

We did, however, uphold the Governor's allocation of the Chevron fund, which was distributed pursuant to a federal consent order based on Chevron's alleged improper marketing practices. *Id.* at 525. Under the consent order, recipient states were provided with a list of proposed acceptable uses for their portion of the fund and were required to obtain approval from the United States Department of Energy and Chevron regarding their ultimate use of the fund money. *Id.* In approving the Governor's allocation of the Chevron fund, we observed that the fund "originated outside Colorado," and that, under the consent order, the fund "was required to be used for a purpose approved ultimately by non-Colorado authorities." *Id.* Moreover, while the Governor retained some authority to determine "which specific purpose among several options should be bene-

fited," we noted that "[t]he fact that a discretionary determination had to be made concerning the object for which those non-Colorado sums would be spent is not the controlling factor in assessing the nature of the fund." *Id.* Ultimately, we concluded that, "under all the circumstances, [the Chevron] fund is most appropriately deemed a trust or custodial fund, to be administered in a trusteeship or custodial capacity." *Id.*

Next, in *Lamm II*, we upheld a provision in the Long Bill directing that certain appropriations be satisfied from specified sources. 704 P.2d at 1374. The Governor argued that "by limiting the cash-fund sources from which the moneys are to be derived the general assembly [exercised] indirect control over the executive functions that generate the cash funds." *Id.* at 1380. In rejecting the Governor's argument, we found "no legislative control of the activities to be used to produce the funds analogous to the close legislative supervision of fund utilization disapproved in *Anderson v. Lamm.*" *Id.* at 1381. Rather, while we recognized that the Long Bill provisions at issue fell within that gray area "in which delineation of the boundary between the legislative and executive powers is difficult," we found that, under the circumstances, the General Assembly's actions did not impermissibly infringe on the "constitutionally protected scope of executive powers." *Id.* at 1381–82.

Finally, in *Lamm III*, we explored in detail the various characteristics which determine whether funds are considered "custodial," noting that "an examination of each federal statute under which Colorado receives funds [was necessary] to determine whether legislative appropriation was permissible." 738 P.2d at 1172. There, we distinguished between the federal government's revenue sharing programs, which provided virtually no guidance as to how states should spend the moneys, federal categorical grants, which "involve[d] a high degree of federal regulation," and federal block grants, which "were conceived as falling between the extensive federal control represented by categorical grants and the absence of federal control represented by revenue sharing." *Id.* at 1159. While the revenue sharing funds were

subject to no federal regulation and, by the federal statute, were to be expended by legislative appropriation, the categorical grants were "a means for furthering national priorities by authorizing grants for programs that met carefully defined federal standards," and therefore were custodial funds subject to executive control. *Id.*

The block grants, however, we examined individually "to determine whether all or a portion of the grant should be subject to legislative appropriation." *Id.* at 1172. We concluded that those grants requiring state matching funds, as well as those grants allowing states to transfer portions of the block grant to other block grant programs, should be treated as state moneys subject to the appropriation process. *Id.* at 1172–73. In reaching this conclusion, we stated:

> We recognize that block grant funds subject to transfer are not state moneys, but we also recognize that the amount of flexibility allowed the state in determining the purposes for which the funds subject to transfer may be spent is inconsistent with a description of the governor's exercise of authority over the funds subject to transfer as "essentially custodial in nature."

*Id.* at 1173 (quoting *Lamm I,* 700 P.2d at 525). Hence, because these moneys fell outside the purview of the executive's custodial powers, such moneys became part of the state's general fund, to be appropriated by the General Assembly. *See* Colo. Const. art. V, § 33 (providing that "[n]o moneys in the state treasury shall be disbursed therefrom ... except upon appropriations made by law"); *Lamm I,* 700 P.2d at 520 (" 'The object of the constitutional provision inhibiting the payment of money from the state treasury, except by an appropriation made

by law, etc., is to prohibit expenditures of the public funds at the mere will and caprice of the crown or those having the funds in custody, without direct legislative sanction therefore ....' ") (quoting *People ex rel Hegwer v. Goodykoontz,* 22 Colo. 507, 511, 45 P. 414, 416 (Colo.1896)).

On the other hand, we found that the remaining block grants constituted custodial funds because "[t]he federal statutes authorizing the grants specify the purposes the state is directed to accomplish with the money, the manner in which the purposes are to be accomplished and the restrictions placed on use of the funds by the federal government." *Lamm III,* 738 P.2d at 1173. As such, these custodial moneys were to be allocated as directed by the federal government, and did not become part of Colorado's general fund.

In sum, when evaluating whether certain moneys constitute custodial funds, we have taken into account all the circumstances surrounding the funds, including, as pertinent here, the source of the funds, the degree of flexibility afforded to the state as to the process by which the funds should be allocated, and the degree of flexibility afforded to the state as to the funds' ultimate purposes.[5] We have essentially distinguished between funds akin to state moneys, which allow the state broad flexibility in determining how such funds should be used, and therefore become part of the state's general fund, and custodial funds, which are to be used only in the manner specified and for the purposes designated by the federal government. While the former, as general fund moneys, are subject to the General Assembly's plenary power of appropriation, the latter fall outside the scope of legislative au-

---

**5.** Of course, the factors to be considered necessarily depend on the circumstances surrounding the grant or appropriation issue before us. For example, in *Lamm III,* we observed that the transfers of federal grant money would "alter the initial objectives of the federal government and affect the allocation of state funds for objectives similar to those affected by the transfer of block grant funds." 738 P.2d at 1173. Based on that impact on federal and state objectives, we found that the transfers were "subject to legislative appropriation." *Id.* Similarly, in another context, the Attorney General has described "custo-

dial funds" as "moneys held in Colorado's treasury for the benefit of a particular person or group." Op. Att'y Gen. No.2003–02 (Apr. 17, 2003) (contrasting "public funds" with "custodial funds" in an opinion regarding the propriety of investing custodial funds held in the Colorado treasury in non-interest bearing general warrant funds). Thus, we recognize that several factors may bear on our ultimate conclusion as to whether specific moneys constitute "custodial funds" and, therefore, each grant must be evaluated on a case-by-case basis.

thority and instead are subject to executive control. With these principles in mind, we turn to the issue before us today.

## III. Analysis

### A. Exclusion of Jobs Act Funds from "Custodial Moneys"

■ Turning first to Interrogatory Number Two, we examine the exclusionary language of House Bill 04–1098, which states that federal funds "that are subject to allocation by the state for the support of general or essential state government services of the type for which expenditures are made in the most recently approved annual general appropriation act" do not constitute "custodial moneys" subject to executive control. Because the exclusionary language of House Bill 04–1098 is essentially the same as the language of the Jobs Act,[6] we have a concrete example of the type of federal grant implicated by House Bill 04–1098. Therefore, we can state with a sufficient degree of certainty that funds distributed to the state in the manner described in House Bill 04–1098 at section (3)(b)(III), are not "custodial moneys." This is because funds such as those under the Jobs Act, disbursed to the state with such minimal guidance as to the process by which such funds shall be allocated and as to the purposes for which the funds may be spent, cannot fairly be described as "custodial" in nature. Rather, such funds are more appropriately deemed general fund moneys. Thus, House Bill 04 1098 may constitutionally exclude such funds from the definition of "custodial moneys." We therefore answer the second interrogatory in the affirmative.

A consideration of the totality of circumstances surrounding the allocation of Jobs Act funds to Colorado, consistent with our prior decisions, supports our conclusion that the funds such as those provided for in the Act are not custodial. Specifically with regard to the first factor—the origin of the funds—the Governor argues that the source of the funds, in this case the federal government, is in and of itself determinative of the funds' status as custodial. The General Assembly, on the other hand, argues that the source of the money is but one criterion to be considered in evaluating the nature of the funds.

We agree with the General Assembly that the fact that the moneys come from the federal government cannot, without more, determine whether funds are custodial. In *MacManus*, we stated rather broadly that "federal contributions are not the subject of the appropriative power of the legislature." 179 Colo. at 222, 499 P.2d at 610. Nevertheless, since we issued that opinion, we have found that some funds deriving from the federal government are more akin to state moneys, and therefore subject to legislative appropriation. For example, we held that federal block grants which were subject to state matching funds or which could be transferred by the states to other block grant programs allowed states too much flexibility to be deemed custodial, and therefore must be allocated as general fund moneys via the legislative appropriation process. *Lamm III*, 738 P.2d at 1172–73. Thus, we cannot rest our analysis of the Jobs Act funds on the nature of their source, but must instead consider the remaining factors regarding the process by which the funds may be allocated and the purposes for which the funds may be used.

The Jobs Act provides virtually no guidance as to what process must be followed in allocating the funds at the state level. The Act requires only that the state pre-certify that it will use the funds in compliance with the Act, 42 U.S.C. § 801(e), but beyond that lacks any form of post-distribution regulation to ensure that the funds are in fact being used and distributed appropriately. Thus, as with the federal block grants we addressed in *Lamm III*, "Congress has left the issue of state legislative appropriation . . . for each state to determine." 738 P.2d at 1169.

---

**6.** The Jobs Act states that funds may be used only to "provide essential government services" or to cover the costs of unfunded federal mandates. 42 U.S.C. § 801(d)(1). The Act further provides that "[a] State may only use funds provided under a payment made under this section for types of expenditures permitted under the most recently approved budget for the State." *Id.* § 801(d)(2).

Lacking any explicit guidance from Congress regarding the appropriation process under the Jobs Act, we turn finally to the degree of flexibility which Congress has afforded the states in allocating the funds. Both the Governor and the General Assembly have placed a great deal of reliance on the Act's language directing the states to use the funds for "essential government services," 42 U.S.C. § 801(d)(1)(A), although they disagree as to the implication of that directive.

The Governor argues that by limiting the use of the funds to "essential government services," the federal government has provided a limited range of purposes within which the executive retains ultimate discretion as to the specific uses. *See, e.g., Lamm I,* 700 P.2d at 525 (describing a fund as custodial where the Governor retained some authority to determine "which specific purpose among several options should be benefited"). On the other hand, the General Assembly argues that by directing states to use the Jobs Act funds on "essential government services," Congress has not limited the states in their use of the funds at all, and that such broad flexibility cannot be consistent with the notion of custodial funds. *See, e.g., Lamm III,* 738 P.2d at 1173 (finding that "the amount of flexibility" allowed states in transferring certain block grant funds was "inconsistent with a description of the governor's exercise of authority over the funds subject to transfer as 'essentially custodial in nature' ").

■ We agree with the General Assembly that Congress has afforded a degree of flexibility regarding the allocation of Jobs Act funds which cannot fairly be described as custodial. We have previously defined custodial funds as those "funds not generated by tax revenues which are given to the state for particular purposes and of which the state is a custodian or trustee to carry out the purposes for which the sums have been provided." *Lamm I,* 700 P.2d at 524. Applying that definition to the Jobs Act funds at issue today, we conclude that, based on the degree of flexibility accompanying the funds, the moneys granted under the Act are not custodial in nature. Instead, such moneys necessarily become part of the state's general fund subject to the legislative appropriation process.

Looking at the plain language of the Jobs Act, the broad category of "essential government services" is not a "particular purpose," but rather allows each state to use the Jobs Act funds as it sees fit, based on its own budgetary needs. Moreover, the debate surrounding state fiscal relief under the Jobs Act demonstrates that the Senators intended states to use the funding as they deemed necessary in a time of fiscal crisis. For example, Senator Susan Collins of Maine stated:

> By no means do we intend to prohibit States from using the revenue sharing portion of this amendment on services or other spending that the State cut in its most recent budget. If a State wanted to use a portion of these funds to restore all or part of a vital service it was forced to eliminate or reduce, it should be allowed to do so. We know that the State is the best *judge of how to prioritize these funds, not the Federal Government.*

149 Cong. Rec. S6148-02, at S6208 (daily ed. May 14, 2003) (statement of Sen. Collins)(emphasis added). Additionally, we find particularly instructive the fact that the Jobs Act was altered from its original form in order to remove a list of specific governmental programs and activities which the funds should serve, and instead listed "essential government services" as the only guidance in directing states regarding use of the Jobs Act funds. *See* H.R. Conf. Rep. No. 108–126, at 168 (2003). Finally, because once the state has received the Jobs Act funds it is no longer subject to any meaningful federal regulation regarding the use of the moneys, the State acts more in the role of an outright owner of those funds than as a guardian or custodian. As such, the moneys should be treated as part of Colorado's general fund and therefore subject to legislative appropriation, rather than as custodial moneys subject to executive control.

Based upon our consideration of all of the above circumstances, we find that the funds at issue today cannot be described as custodial. Unlike those block grants held to be custodial in *Lamm III,* the Jobs Act funds do

not "specify the purposes the state is directed to accomplish with the money, the manner in which the purposes are to be accomplished and the restrictions placed on use of the funds by the federal government." 738 P.2d at 1173. We therefore affirm that House Bill 04–1098 is constitutional insofar as it expressly excludes from the definition of "custodial moneys" funds distributed in the same manner as those allocated pursuant to the Jobs Act.

## B. The Definition of "Custodial Moneys"

 We next address Interrogatory Number One, turning our attention to the portion of House Bill 04–1098 which defines "custodial moneys." The language used to define "custodial moneys" essentially relies on various factors discussed in our case law, providing four basic elements which, together, constitute "custodial moneys": (1) the funds originate from outside of Colorado; (2) the funds are provided for a particular purpose or program; (3) the funds contain restrictions or defined standards for their use or otherwise require approval for their use from a non-state entity; and (4) the funds are to be held by the state in a custodial capacity in order for the state to carry out the funds' designated purpose. H.B. 04–1098 at § (3)(a). Today we have been asked to decide whether this definition comports with the Colorado constitution as well as our case law construing the relevant constitutional provisions.

We find that the definition of "custodial moneys" included in House Bill 04–1098 comports with constitutional principles insofar as it simply codifies some of those factors which we have already held to be relevant in determining whether particular moneys are custodial funds. See, e.g., Lamm I, 700 P.2d at 524 (defining custodial funds as "funds not generated by tax revenues which are given to the state for particular purposes and of which the state is a custodian or trustee to carry out the purposes for which the sums have been provided").

However, we do not recognize the definition at issue today as an exhaustive list of factors which must be considered when evaluating whether funds are custodial. See note 4, supra. Rather, all grants of money to Colorado must be considered on a case-by-case basis, with due regard being given to all the circumstances surrounding the allocation, including, but not limited to, those factors listed in House Bill 04–1098 at section (3)(a). Given that the nature of federal grants has been a constantly evolving process which has always required us to evaluate each grant individually, and without knowing how future grants will be disbursed, we are unable to answer the first interrogatory with any degree of certainty. See Lamm III, 738 P.2d at 1159 (analyzing the nature of federal revenue sharing, categorical grant, and block grant programs). Thus, we decline to answer the first interrogatory.

## III. Conclusion

On the basis of the analysis set forth above, we answer the interrogatories submitted to us as follows:

*Interrogatory No. One:*

We decline to answer the interrogatory.

*Interrogatory No. Two:*

Yes, the General Assembly may constitutionally exclude from the definition of "custodial moneys" those moneys granted by the federal government to Colorado for the support of general or essential state government services of the type for which expenditures are made in the most recently approved annual general appropriation act, including but not limited to additional payments received by the state under the Jobs Act.

Justice COATS dissents.

JUSTICE COATS, dissenting.

I agree with the majority's decision not to answer question number one, but because I am of the opinion that it should have exercised similar restraint with regard to question number two, I respectfully dissent.

The majority's approach to both interrogatories makes clear its understanding that the nature of custodial funds, and therefore the scope of the Governor's right and obligation to administer funds received from sources

outside the state, is not a matter of legislative prescription but rather one of constitutional interpretation. Despite implicitly acknowledging that legislation attempting to limit custodial moneys is necessarily ineffectual, and that the court's answer to these interrogatories can affect no ongoing case or controversy, the majority seizes the opportunity to refine its concept of "custodial moneys" and, correspondingly, alter the relative powers of the three branches of government over spending. Its subtle, but to my mind radical, departure from existing law gives to the judicial branch an almost unlimited discretion to decide, in each individual case, whether moneys appropriated to the state by the federal government may be directly administered by the governor or must be further appropriated by the general assembly.

It is well-established in this jurisdiction that it is solely the prerogative of the legislature to appropriate state moneys, and likewise, it is solely the prerogative of the executive to administer moneys once appropriated. *See Colorado General Assembly v. Lamm,* 738 P.2d 1156 (Colo.1987); *Colorado General Assembly v. Lamm,* 700 P.2d 508 (Colo.1985); *Anderson v. Lamm,* 195 Colo. 437, 579 P.2d 620 (1978); *MacManus v. Love,* 179 Colo. 218, 499 P.2d 609 (1972). This duty of the executive extends to funds held in trust by the state, regardless of the source or government appropriating them. *See MacManus,* 179 Colo. at 221, 499 P.2d at 610. If funds are merely distributed to the state, and not designated for any purpose other than the general revenue, they clearly must be appropriated by the general assembly before they can be administered; however, if they are accompanied by directions for their use, it is the responsibility of the executive to see that they are applied to the purposes for which they were directed. *See Lamm,* 738 P.2d at 1169.

Until today, it has been accepted that the breadth or narrowness of the appropriation was a matter for the appropriating government—not the state legislature, unless the state legislature was itself the appropriating authority. The flexibility, or discretion, permitted the administering authority became an issue in our prior analyses only to the extent that such discretion could be used to contradict major legislative budgeting determinations or dramatically alter the objectives of the appropriating authority in making the appropriation in the first place. *See Lamm,* 738 P.2d at 1173. Thus, we have previously found that the governor's transfer of funds from one executive department to another, despite arguable statutory authority for doing so, violated the general assembly's plenary power of appropriation. *Lamm,* 700 P.2d at 520.

Similarly, we have recognized that allowing the state the flexibility to transfer portions of federal block grants to uses other than those for which the grants were initially designated is not consistent with the governor's authority to administer appropriated moneys. *Lamm,* 738 P.2d at 1173. This conclusion, however, did not result from any failure of the federal government to provide sufficient guidance for expenditure of the funds. We expressly found an inconsistency with the governor's authority for the reason that such transfers alter the initial objectives of the federal government and affect the allocation of state funds for objectives similar to those affected by the transfer of block grant funds. *Id.* By pointedly separating our reference to "flexibility" from the rationale that gave it significance, the majority recasts our prior holdings into a concern for specificity of purpose and designates the judiciary as the sole arbiter of adequate specificity. *See* maj. op. at 1202 (quoting *Lamm,* 738 P.2d at 1173).

Although the court ostensibly gives its blessing to a statute excluding from the definition of "custodial moneys" any federal funds disbursed in the terms of the Jobs Act of 2003, it is clear from its rationale that the proposed statute is superfluous. The kind and degree of flexibility that are permissible, according to the majority rationale, will be determined by the courts, in the totality of the circumstances of each case, regardless of legislative action. While this court is constitutionally permitted to answer interrogatories from the legislature, it has always exercised its discretion to refuse such requests except upon solemn occasions, concerning matters of great importance. *See* Colo. Const. art. VI, § 3 ("The supreme court shall

give its opinion upon important questions upon solemn occasions when required by the governor, the senate, or the house of representatives...."); *Board of County Comr's v. County Road Users Assoc.,* 11 P.3d 432, 439 (Colo.2000)(The Colorado Constitution authorizes the supreme court to issue an advisory opinion "upon solemn occasions when required by the governor, the senate, or the house of representatives."); *In re Interrogatories,* 111 Colo. 406, 407–408, 141 P.2d 899, 900 (1943); *In re Senate Resolution Relating to Senate Bill No. 65,* 12 Colo. 466, 468, 21 P. 478, 479 (1889)(The framers of our constitution specified that the supreme court jurisdiction should be exercised in other than purely appellate or supervisory circumstances only when relating to public rights and "propounded upon solemn occasions, and it must possess a peculiar or inherent importance not belonging to all questions of the kind."). In my opinion, having once decided that the legislature cannot constitutionally limit the authority of the executive to administer moneys appropriated from sources outside the state, the majority should have refused to answer the interrogatories, or at most, answered merely that the proposed legislative action is necessarily inconsequential in determining the scope of the executive's constitutional authority.

Instead, in answering the interrogatory, the majority carves out a greater role for the judiciary in the spending process. While the courts may not themselves distribute federal funds given to the state, they will henceforth, on a case-by-case basis, decide whether the executive or the legislative branch will be entitled to that privilege. From this point on, the distribution of federal moneys to the states for particular, named purposes will not necessarily amount to an appropriation to be "administered" by the state. Rather, the courts must decide, based on all (but apparently not any specific or delineated) relevant factors and circumstances whether such federal directions are specific enough for the moneys to be treated as an appropriation to

be "administered" or merely as an undesignated gift, requiring "appropriation" by the state.

By failing to recognize its departure from our prior holdings, the majority not only minimizes the judiciary's increased power over federal grants; it also gratuitously criticizes the governor, suggesting that he exceeded his constitutional authority by spending more than a hundred million dollars in federal disbursements. For the reasons I have briefly outlined, I strongly disagree. To me it is clear that the governor and attorney general were right in concluding, at least until today, that these federal moneys were custodial in nature and were to be administered by the executive. Ironically, Congress' choice to limit these federal funds to government services like those for which the state legislature had most recently made appropriations ensured that they could not be used to alter the objectives of either the state or federal government and thereby limited the discretion of the state administering authority precisely as required by our prior jurisprudence.

As a practical matter, I also fear that today's holding will have the exact opposite effect of that envisioned by the general assembly's proposed legislation, making it less rather than more clear whether future federal disbursements (except those using this identical formula) will be considered custodial moneys. Because I consider the majority's answer to the second interrogatory to be an unjustified departure from our prior holdings construing the state constitution and because I believe it will work an unwise shift of power among the three branches of state government, I respectfully dissent.