907 P.2d 1001

STATE of New Mexico ex rel. Robert M. SCHWARTZ, Second Judicial District Attorney, Henry R. Valdez, First Judicial District Attorney, G. Greg Valdez, Third Judicial District Attorney, Luis B. Juarez, Fourth Judicial District Attorney, Anthony W. White, Sixth Judicial District Attorney, Sammy L. Pacheco, Eighth Judicial District Attorney, and Mike Runnels, Thirteenth Judicial District Attorney, Petitioners,

v.

Hon. Gary JOHNSON, Governor of the State of New Mexico, David Harris, Secretary, New Mexico Department of Finance and Administration, and John Gasparich, Director of the Budget Division, Department of Finance and Administration, Respondents,

and

State Corporation Commission and Senator Shannon Robinson, Intervenors.

No. 23187.

Supreme Court of New Mexico.

Dec. 7, 1995.

Robert M. Schwartz, District Attorney, Steven S. Suttle, Assistant Chief Deputy District Attorney, Albuquerque, for Petitioners.

Tom Udall, Attorney General, Gerald T.E. Gonzalez, Martha A. Daly, Elizabeth A. Glenn, Assistant Attorneys General, Jill K. Sweeny, Special Assistant Attorney General, Santa Fe, for Respondents.

Avelino A. Gutierrez, Special Assistant Attorney General, Santa Fe, for Corp. Com'n.

Sen. Shannon Robinson, pro se.

## OPINION

RANSOM, Justice.

1. Petitioners and Intervenors (collectively, "Petitioners") seek writs of mandamus directed to the Honorable Gary Johnson, Governor of the State of New Mexico, David Harris, Secretary, New Mexico Department of Finance and Administration, and John Gasparich, Director of the Budget Division, Department of Finance and Administration (collectively, "the Governor"). Petitioners seek to have us mandate that the Governor resume monthly one-twelfth allotments of monies appropriated in the General Appropriations Act of 1995 to the various officers, departments and agencies of the government, and that the Governor restore funds already withheld under the Governor's general-fund allotment policy of August 31, 1995. Under that policy, "to encourage spending patterns that anticipate appropriation reductions by the legislature," the Governor amended the ten allotments remaining in this fiscal year to reflect a two and one-half percent across-the-board reduction in total appropriations. We have considered whether Petitioners have standing to bring this ac-

tion, as well as the propriety of any prohibitive aspect to a writ of mandamus. We have decided these issues in the affirmative in reliance on applicable precedent. *E.g., State ex rel. Clark v. Johnson,* 120 N.M. 562, 904 P.2d 11 (1995); *State ex rel. Sego v. Kirkpatrick,* 86 N.M. 359, 524 P.2d 975 (1974). We grant the relief sought by Petitioners.

2. *The issue.* We address whether, under the Governor's statutory authority to regulate the periodic allotment of funds to state agencies, the legislature intended that the Governor make allotments based on regularly-recurring needs of governmental agencies to meet the legislature's choice of purpose or whether the legislature intended that allotments may be made based on other sound fiscal policy within the discretion of the executive branch. As argued by the Governor, this issue may be viewed as whether his authority to regulate the state fisc is to be measured solely by the specific statutory and constitutional prohibitions against incurring liabilities without general funds to meet those liabilities. *See, e.g.,* NMSA 1978, §§ 6-3-8, 6-4-2 (Repl.Pamp.1992); NMSA 1978, § 6-5-6 (Cum.Supp.1995); NMSA 1978, § 8-6-7 (Repl.Pamp.1994); N.M. Const. art. IV, § 30, art. IX, §§ 7, 8.[1]

3. *Principles not in dispute.* The Governor has recognized correctly that, under constitutional separation-of-powers principles enunciated in Article III, Section 1 of the New Mexico Constitution, the legislature cannot delegate its power to appropriate money unless specifically authorized by the state constitution. *Gamble v. Velarde,* 36 N.M. 262, 266, 13 P.2d 559, 561 (1932). The Governor makes no claim of constitutional authorization. Further, the Governor has recognized correctly that, absent a proper delegation of authority from the state legislature, the executive branch is precluded from exercising any control over the expenditure of appropriated money in a manner that would affect the legislature's choice of purpose. *See State ex rel. Holmes v. State Bd. of Fin.,* 69 N.M. 430, 437–42, 367 P.2d 925, 930–34 (1961).

---

1. The Governor does not anticipate a general-fund deficit, and thus we do not consider or

decide what constitutional or statutory authority resides in the executive to avoid a deficit.

4. As in *Holmes*, Petitioners and the Governor here agree, moreover, that when the legislature purports to delegate authority to control the expenditure of appropriated money, it must provide reasonable standards as a guide to the exercise of the discretionary powers conferred. *See id.* at 437, 367 P.2d at 930. In *Holmes*, we held that:

> [T]he unrestricted and unguided power contained in [a specific statutory authorization to the state board of finance to reduce all annual operating budgets not to exceed ten percent, except interest and principal payments on debts and salaries of elected state officials] is an unconstitutional grant to [the board] of a legislative power and that [the board] may not legally proceed thereunder.

*Id.* at 442–43, 367 P.2d at 934.

5. While we discuss more factually-related cases later in this opinion, we note that the principles agreed to here have been articulated in several other jurisdictions. Frequently, as we later conclude to be appropriate in this case, statutes have been interpreted to avoid constitutional infirmity in the delegation of authority. *See, e.g., Lovelace Medical Center v. Mendez*, 111 N.M. 336, 340, 805 P.2d 603, 607 (1991) ("It is ... a well-established principle of statutory construction that statutes should be construed, if possible, to avoid constitutional [separation-of-powers] questions."). In *County of Oneida v. Berle*, 49 N.Y.2d 515, 427 N.Y.S.2d 407, 404 N.E.2d 133 (1980), the court held that a sewage treatment appropriation which expressly stated that "moneys hereby appropriated shall be ... apportioned [to municipalities] in accordance with regulations promulgated by the commissioner of environmental conservation and as approved by the director of the budget," 1976 N.Y. Laws, ch. 53,

> did not confer unfettered discretion upon the director to withhold all or any portion of the appropriation. Such a legislative delegation would be drastic indeed, and may not be inferred from ambiguous language. This is especially so in instances where the Legislature has provided no guidelines for the exercise of discretion.

*Berle*, 404 N.E.2d at 138. The court held further that "under the State Constitution, the executive possesses no express or inherent power—based upon its view of sound fiscal policy—to impound funds which have been appropriated by the Legislature." *Id.* "[T]he executive branch may not override enactments which have emerged from the lawmaking process. It is required to implement policy declarations of the Legislature, unless vetoed or judicially invalidated." *Id.* at 137.

6. Similarly, the Colorado Supreme Court has considered the governor's authority to transfer funds from the departments of the executive branch for which the funds were appropriated to other executive departments. In *Colorado General Assembly v. Lamm*, 700 P.2d 508, 517 (Colo.1985), a statute provided that the powers and duties of the state's controller of the currency "shall be ... [t]o recommend transfers between appropriations under the provisions of law, to become effective upon approval by the governor." The court held that the phrase "under the provisions of law" required some statutory authorization independent of the controller statute and further held that giving unlimited authority to the governor to approve transfers would amount to an unconstitutional delegation to the chief executive of legislative powers of appropriation. *Id.* Citing to *Anderson v. Lamm*, 579 P.2d 620 (Colo.197?), a dissent made the point that an appropriation is to be viewed "as a legislative authorization to use so much of the specified sum as necessary to achieve the purpose of the appropriation.... [T]he Governor is constitutionally empowered to faithfully execute the laws of the state [and] has the inherent authority to administer funds appropriated by the legislature...." *Id.* at 528 (Quinn, J., dissenting). The court held, however, that the authority to administer appropriations and to control "how the money is to be allocated" is limited "by the principle that the constitution vests the General Assembly with authority to determine 'the *amount* of *state funds*' to be spent for particular purposes." *Id.* at 519 (quoting *Anderson*, 579 P.2d at 626).

7. The thrust of the dissent in *Colorado General Assembly* seems to be that "a budgetary transfer by a coordinate department

of government might well be made in a manner that is both consistent with the legislative choice of purpose and the executive power of administration and management. Whether the transfers in question can be so reconciled is a matter that should be determined on the basis of a full evidentiary hearing devoted to that issue." 700 P.2d at 531. In the case before us, the Governor likewise argues that, "[a]s long as it does not frustrate the purposes of the appropriations, [the Governor's] control over allotments is clearly within [his] authority to administer expenditures, and does not infringe upon the legislature's power over appropriations." The Governor's policy, however, is based not on *existing* legislative choice, but on *anticipated* appropriation reductions by the legislature. We therefore do not perceive a disputed factual issue as to whether the Governor's allotment reductions could be considered consistent with legislative choice of purpose.

8. Finally, in *State of Nevada Employees Association, Inc. v. Daines*, 108 Nev. 15, 824 P.2d 276 (1992), based on projected revenue shortfalls, the Nevada state board of examiners deferred allocation and disbursement of funds appropriated for salary adjustments for up to three months from the time the legislature contemplated their enactment. The board relied upon legislative authorization that

upon recommendation of the director of the department of administration, [the board] may allocate and disburse ... out of the money appropriated by this section such sums of money as may from time to

time be required, which when added to the money otherwise appropriated or available equals the amount of money required to pay the salaries ... under the adjusted pay plan.

*Id.* 824 P.2d at 278. The court held that the executive department was not permitted by this language to defer disbursement.

Close examination of the language of the act in this case reveals that "may" in the act is conditional rather than permissive.

... The language of the act requires the board of examiners to allocate additional funds to state agencies to meet these pay increases upon the conditions set forth, *i.e.*, when the funds previously appropriated for salaries are insufficient to pay the salaries required under the revised grade and step pay plan.

*Id.* Further, citing *Holmes* and other cases, the court noted that "it is well established that the power of controlling the public purse lies within legislative, not executive authority." *Id.* at 279.

9. *The Governor's position.* In the case before us today, the Governor asserts that the legislature has delegated allotment authority to him and that it has supplied standards sufficient for him to proceed temporarily to reduce allotments in anticipation of legislative ratification. The Governor relies upon NMSA 1978, Section 6–3–6 (Repl. Pamp.1992). That statute authorizes the state budget division to provide regulations for "the periodic allotment of funds that may be expended by any state agency."[2] Except

2. The regulation relied upon by the Governor is Department of Finance and Administration Rule 69–1(D)(1), Amendment No. 3, which provides:
*Allotments*—As provided in Section 6–3–6 NMSA 1978, the State Budget Division is authorized to provide regulations for the periodic allotment of funds that may be expended by any state agency.... Appropriation allotments are normally made to agency accounts in equal monthly installments. The State Budget Division, however, may from time to time adjust allotment schedules based on overall cash flow requirements. This could result in a delay in the receipt of allotments, a change in individual allotment amounts, or a rescheduling of allotment distributions; but in no case shall the total allotments to an agency account during the fiscal year be less than the agency's total appropriation for that account. The State

Budget Division will provide an affected agency with the greatest possible notice of an adjustment to that agency's allotments.
We do not reach a question briefed by the parties as to whether this regulation was repealed in 1989.
The Governor also relies on a current budgeting procedure manual that permits the executive department to revise allotments "[i]f the General Fund cash flow deviates significantly from the original projection.... This will normally occur if cash resources are scarcer than the projection." *See* ¶ II(12) of the Manual of Central Accounting, IV.E.1, effective 11/1/89. As more fully developed in the text of this opinion, however, the issue in this case is not the sufficiency of the executive's own fiscal policy standards; it is the sufficiency of legislative standards governing the grant of authority to the executive branch.

for agencies whose operations are more efficiently measured by periods other than a fiscal year, or agencies planning major expenditures for capital outlay, there is no qualification of what is meant by "periodic allotment." The Governor argues that the term contemplates executive policy decisions impacting the amount to be allocated, such as the prudent maintenance of the general-fund reserves at issue here. The Governor argues that his allotment authority is not restricted to the timeliness of allocations to meet the purposes for which appropriations were made—though he would consider hardships upon application by individual agencies.

10. As justification for his policy directive, the Governor relies on the Director of the State Budget Division for the Department of Finance and Administration who has stated the opinion that

> the state should build reserves to 3 percent of the revenue anticipated to be collected during fiscal year 1995–96 or $83 million by the end of this fiscal year, and build reserves to [a prudent] 5 percent or about $140 million by the end of the fiscal year 1996–97.... The Department initiated the temporary reduction in allotments to prepare state agencies for the possibility of a reduction in appropriations through legislative action and to prevent reserves from being completely depleted.

The Governor also relies on the Department Secretary who has stated, "[t]he current and projected reduction in revenue and reserves may cause bond rating agencies to review and downgrade their assessment of New Mexico's bond rating."

11. The Governor concedes that account balances sufficient to cover appropriations do exist and that projected revenues together with unrestricted reserve balances in the general fund are sufficient to pay monthly one-twelfth allotments of monies appropriated by the legislature. That is, no liabilities are expected to be incurred without general funds to meet those liabilities. The Governor does not now anticipate a deficit necessitating a contingency plan as mandated by the legislature in the General Appropriations Act of 1995: "If at any time these revenue estimates indicate that the state will be in a deficit position, the department shall present a contingency plan that outlines the methods by which the administration intends to address the deficit." 1995 N.M. Laws, ch. 30, § 3(J). In any event, argues the Governor, barring action by the legislature which changes the amounts appropriated for the current fiscal year, or the actual materialization of a deficit, agencies will receive the total amount of their appropriations....
If Petitioners or other state government agencies require an amount in excess of their monthly allotments as presently calculated, they may apply to DFA for a greater amount, in accordance with the procedures specified in the Manual of Central Accounting.... [T]he temporary decrease in allocations implemented by [the Governor] is not an attempt by the executive to limit or withhold Petitioners' appropriations, reduce Petitioners' budgets or otherwise infringe upon the legislature's constitutional power of appropriation.

. . . .

> [The Governor's] steps to temporarily reduce agency allocations provides the legislature the opportunity to act.

12. *Analysis.* Section 6–3–6 does not specify that allotments for agencies whose needs are efficiently measured as a constant throughout the fiscal year are to be made in one-twelfth increments, as historically has been the practice under Department policy. On the other hand, neither is there specific language that gives the Governor discretion to temporarily adjust allotments in situations where cash flow into the state treasury is insufficient at the time the allotments are made to adequately fund the allotments without use of general-fund reserves.[3]

13. The law does provide that, for cash flow purposes, current expenses and obligations of state government may be paid from any fund or account regardless of accounting records if it reasonably may be expected that at the end of the fiscal year the

---

**3.** The Governor has explained that as revenue is collected it is placed in the state's appropriation account and when that account contains insuffi-

cient revenue to cover allotments the state relies on the balances in its reserve accounts to provide funds for state agency expenditures.

balances in funds specified for another purpose will be fully restored. NMSA 1978, Section 6-4-6 (Repl.Pamp.1992). Only the transfer of funds from certain restricted sources is prohibited in the absence of specific authorization under law. Section 6-4-6(B).

■ 14. Even if one were to read the phrase "periodic allotment" to contemplate the Governor's consideration of fiscal policy related to general-fund reserve levels and to contemplate something other than equal allocations at the end of specific periods set forth by regulation, the standards for resulting reductions in appropriations—if not totally absent—are far less clear than the standards found inadequate in *Holmes.* As this Court read the statutory authorization in *Holmes,*

the grant is absolute and is totally devoid of restraints, direction or rules. Accordingly, the fact that respondent acted only under certain self-imposed restraints can in no way serve to supply what has been omitted. It is not what has been done but what can be done under a statute that determines its constitutionality.

69 N.M. at 440, 367 P.2d at 932. The legislature must exercise its "exclusive power of deciding how, when, and for what purpose the public funds shall be applied in carrying on the government." *Id.* at 441, 367 P.2d at 933 (quoting *Zimmerman v. Dammann,* 229 Wis. 570, 283 N.W. 52, 54 (1938)).

15. In *Chiles v. Children A, B, C, D, E and F,* 589 So.2d 260 (Fla.1991), based on his determination of a general revenue shortfall, the governor directed all state agencies to prepare revised financial plans that would reduce their current operating budgets. The statute assigning to the executive branch authority to reapportion the state budget provided that "[t]he [administration] commission may, by affirmative action, reduce all approved state agency budgets and releases by a sufficient amount to prevent a deficit in any fund." *Id.* at 263. The Florida Supreme Court, after reviewing three hundred years of political philosophy and practice, reiterated that, "under the doctrine of separation of powers, the legislature may not delegate the power to enact laws or to declare what the law shall be to any other branch. Any at-

tempt by the legislature to abdicate its particular constitutional duty is void." *Id.* at 264.

16. Noting that "the power to *reduce* appropriations, like any other lawmaking, is a legislative function," the court stated: "The legislative responsibility to set fiscal priorities through appropriations is totally abandoned when the power to reduce, nullify, or change those priorities is given over to the total discretion of another branch of government." *Id.* at 265.

This is not to say that the legislature cannot permit another branch or agency to respond to a budget crisis caused by unexpected events between legislative sessions. The legislature can delegate functions so long as there are sufficient guidelines to assure that the legislative intent is clearly established and can be directly followed in the event of a budget shortfall. Carefully crafted legislation establishing, among other things, the extent to which appropriations may be reduced, coupled with a recitation of reduction priorities and provisions for legislative oversight, might pass facial constitutional muster. What the legislature *cannot* do is delegate its policy-making responsibility.

*Id.* at 268 (footnote omitted). The delegation of authority to the commission was held to do just that. As articulated in *State v. Fairbanks North Star Borough,*

the constitutionality of a delegation is determined on the basis of the scope of the power delegated and the specificity of the standards to govern its exercise. "When the scope increases to immense proportions ... the standards must be correspondingly more precise." The essential inquiry is whether the specified guidance "sufficiently marks the field within which the administrator is to act so that it may be known whether he has kept within it in compliance with the legislative will."

736 P.2d 1140, 1143 (Alaska 1987) (quoting *Synar v. United States,* 626 F.Supp. 1374, 1386, 1387 (D.C.Cir.1986)).

17. In *Fairbanks North Star Borough* the Alaska Supreme Court held unconstitutional a statute purporting to endow the gov-

ernor with discretion to withhold or reduce appropriations—"in effect to amend the budget"—when anticipated receipts and surpluses appeared inadequate to meet appropriation levels.

> The legislature has articulated no principles, intelligible or otherwise, to guide the executive. Under [the statute in question], the governor decides when projected revenues are inadequate to meet appropriations. Once he makes that determination, he may or may not assume authority under the statute. If he decides to act, he has total discretion as to which appropriations to cut and to what extent. The statute does not expressly require him to limit his cuts to the extent of the shortfall nor does it provide for adjustment of the cuts to the actual revenues received.

*Id.* at 1143 (footnote omitted). In reliance on our opinion in *Holmes,* the Alaska court noted that "the issue in this case is not what has been done under the statute; rather it is what can be done." *Id.* at 1144.

18. The Supreme Court of Connecticut found that the legislature had provided sufficient guidance for the exercise of executive discretion in *University of Connecticut Chapter AAUP v. Governor,* 512 A.2d 152 (Conn.1986). There, a statute required each budgeted agency to submit to the governor a requisition for the allotment of the amount necessary to carry on the agency's work during each quarter of the fiscal year. "Allotment" was defined generally as the action by which the executive branch sets aside funds sufficient to cover a portion of the expenditure authorized by the appropriations act. At issue was the constitutionality of another statute permitting the governor to reduce budgetary allotments. Considering the budgetary statutes as a whole, the statute in question was interpreted to limit the governor's reduction power to that of "avoiding a deficit" or to "prevent a deficit." In that sense, the Connecticut case is factually distinguishable from our case in which the Governor does not anticipate a deficit necessitating a contingency plan as mandated by the legislature. The Connecticut case is nonetheless instructive on the issue of sufficient legislative guidance.

19. In Connecticut, due to anticipated decreases in state revenues and increases in state expenses likely to cause a budgetary deficit, the governor reduced quarterly allotments to state universities. The section under which the governor acted did provide specifically that, if (1) due to a change in circumstances since the budget was adopted certain reductions should be made in various allotments of appropriations or (2) the estimated budget resources during such fiscal year would be insufficient to pay all appropriations in full, the governor could modify such allotments to the extent the governor deemed necessary, provided he could reduce allotments to no more than three percent in any fund or five percent in any appropriated account. The court interpreted these standards to authorize the governor to control the timeliness and the amounts of the allotments depending on the state of the revenues received and not on sufficiency to cover appropriations alone, and it deemed these standards constitutionally sufficient because they were "as definit[e] as is reasonably practicable under the circumstances." *Id.* at 159 (quoting *Wilson v. Connecticut Prod. Dev. Corp.,* 355 A.2d 72, 77 (Conn.1974)).

20. Also, in *North Dakota Council of School Administrators v. Sinner,* 458 N.W.2d 280 (N.D.1990), when projections predicted reduced revenues, the director of the office of management and budget implemented statutory provisions authorizing the director to reduce appropriations uniformly by two percent through an allotment process. When it became apparent that actual revenues would in fact exceed the projection upon which the legislature based its appropriations, the director declined to restore the reductions. Relevant to our case was the issue of the constitutionality of the statutory delegation of legislative authority. Noting that the delegation of powers to ascertain certain facts which would bring the provisions of a law into operation by its own terms is not an unconstitutional delegation of legislative powers, the North Dakota Supreme Court addressed whether the law set forth reasonably clear guidelines to enable the director to ascertain the facts. By its terms, the statute in question required the director

to determine that one or more of four enumerated factors was present before an allotment reducing an appropriation could be made. Upholding the constitutionality of the statute, the court followed the modern view which recognizes that "in a complex area, it may be necessary and appropriate to delegate in broad and general terms, as long as there are adequate standards and procedural safeguards." *Id.* at 285 (citing *Lawrence v. Lawrence,* 432 N.W.2d 897, 897–98 (N.D. 1988)). In a specially concurring opinion, a warning was sounded that there is a distinction between the legislature's regulatory and administrative functions which are freely delegated and the more basic rule of appropriating the funds wherewith those delegated functions are to be performed. *Id.* at 286 (Vande Walle, J., specially concurring).

21. It is clear to us from this review of our landmark opinion in *Holmes* and from the application of the same universally recognized principles under various factual circumstances in other jurisdictions that the authorization under Section 6–3–6 for the Governor to provide regulations for "the periodic allotment of funds that may be expended by any state agency" does not alone supply standards sufficient to authorize executive department regulation of the state fisc. Although we do not here go beyond consideration of the purported delegation of authority to the Governor to direct across-the-board reductions in appropriation allotments based on fiscal policies of the executive branch, we note that, as an Intervenor, Senator Robinson has shown that each agency of government, in the implementation of an across-the-board reduction, must pick and choose without any standards whatsoever which legislative choices of purpose to meet and which to curtail. The New Mexico State Corporation Commission, also as an Intervenor, persuasively relies on the holding and rationale of *Chiles* to argue that the legislature cannot delegate to the executive branch allocation authority that forces upon an agency of a department or upon a constitutionally-created commission any requirement to make policy decisions about appropriations.

22. *Conclusion,* We find no statutory authority by which the Governor may regulate allotments through the application of discretionary fiscal policy. To withstand constitutional challenge Section 6–3–6 must be interpreted to require that periods and amounts of allotments be designed to meet the constant needs of governmental agencies to achieve the purposes of appropriations. Here, the Governor's fiscal policy is not related to those needs; it is related to the prudent maintenance of the general-fund reserves. As we observe above, this policy is based not on *existing* legislative choice, but on *anticipated* appropriation reductions by the legislature. Consequently, the writ sought by Petitioners shall issue.

23. **IT IS SO ORDERED.**

BACA, C.J., and FRANCHINI, FROST and MINZNER, JJ., concur.