The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number:**

**Filing Date:** October 12, 2023

**NO. S-1-SC-38996**

**STATE ex rel. JACOB R. CANDELARIA, in his capacity as STATE SENATOR, and GREGORY BACA, in his capacity as STATE SENATOR,**

Petitioners,

and

**K. JOSEPH CERVANTES, in his capacity as STATE SENATOR, DANIEL IVEY-SOTO, in his capacity as STATE SENATOR, GEORGE K. MUÑOZ, in his capacity as STATE SENATOR, and GERALD ORTIZ Y PINO, in his capacity as STATE SENATOR,**

Intervenors-Petitioners,

v.

**MICHELLE LUJAN GRISHAM, in her capacity as GOVERNOR,**

Respondent,

and

**TIM EICHENBERG, in his capacity as STATE TREASURER,**

Real Party in Interest.

**ORIGINAL PROCEEDING**

Candelaria Law
Jacob R. Candelaria
Albuquerque, NM

Baca Law Offices
Gregory Baca
Las Lunas, NM

for Petitioners

K. Joseph Cervantes
Las Cruces, NM

Daniel A. Ivey-Soto
Albuquerque, NM

George K. Muñoz
Gallup, NM

Gerald Ortiz y Pino
Albuquerque, NM

Intervenors-Petitioners, pro se

Office of the Governor
Holly Agajanian, Chief General Counsel
Kyle P. Duffy, Associate General Counsel
Maria S. Dudley, Associate General Counsel
Santa Fe, NM

for Respondent

L. Helen Bennett, P.C.
Linda Helen Bennett
Albuquerque, NM

for Real Party in Interest

**OPINION**

**VARGAS, Justice.**

{1}    The federal government, through the American Rescue Plan Act of 2021, provided approximately $1.75 billion in COVID-19-related financial assistance to New Mexico. This case presents a separation of powers question concerning whether the legislative or executive branch controls the funds. Consistent with our writ of mandamus issued November 18, 2021, we conclude that the authority lies with the Legislature.

## I.    BACKGROUND

{2}    In response to the challenges posed by the COVID-19 pandemic, the President signed the American Rescue Plan Act of 2021 (ARPA) into law. Pub. L. No. 117-2, 135 Stat. 4 (codified as amended in scattered sections of the U.S.C.). Among other things, this law established the Coronavirus State Fiscal Recovery Fund. 42 U.S.C. § 802; Coronavirus State & Loc. Fiscal Recovery Funds, *Interim Final Rule*, 86 Fed. Reg. 26786-87 (May 17, 2021) (codified as amended at 31 C.F.R. pt. 35). The funds "are intended to provide support to State, local, and Tribal governments (together, recipients) in responding to the impact of COVID-19 and in their efforts to contain COVID-19 on their communities, residents, and businesses." 86 Fed. Reg. at 26787.

{3} Of the $350 billion in COVID-related financial assistance provided to eligible recipients, *id.* at 26816, New Mexico received approximately $1.75 billion in ARPA funds. The Legislature attempted to appropriate the ARPA funds through the General Appropriation Act of 2021, 2021 N.M. Laws, ch. 137, §§ 1-15. In response, Governor Michelle Lujan Grisham vetoed the portions that related to ARPA funds, "asserting that the Legislature . . . lack[ed] the authority to direct the Executive's administration of federal funds."

{4} Prior to the commencement of this proceeding, the Governor spent approximately $600 million of the $1.75 billion in ARPA funds received by New Mexico, leaving approximately $1.08 billion to be distributed. Petitioners State Senators Jacob R. Candelaria and Gregory Baca filed suit against the Governor, seeking a writ of mandamus prohibiting her from expending any additional ARPA funds. Petitioners also requested a stay prohibiting the Governor and any official under her control from "transferring, encumbering, committing, expending or appropriating" any additional ARPA funds for the duration of these proceedings. Petitioners limit their request for a writ to the remaining $1.08 billion in ARPA funds and do not request relief related to the $600 million previously spent by the Governor. We denied the request for a stay and requested responses from the Governor and from Tim Eichenberg, New Mexico State Treasurer and real party in

interest in this proceeding. We also allowed the intervention of four additional state senators. Following oral argument, we issued a prohibitory writ of mandamus and an order providing that the Governor and State Treasurer "shall not transfer, encumber, commit, expend, or appropriate any additional [ARPA] funds . . . absent legislative appropriation." This opinion explains the basis for that order.

## II. DISCUSSION

{5}	Before reaching the merits of Petitioners' claims, we first consider two preliminary matters: (1) whether Petitioners have standing and (2) whether a writ of mandamus is the proper form of relief.

### A. Standing

{6}	Petitioners assert that they have standing on two separate grounds. First, they contend that the dispute between the legislative and executive branches of government confers standing as a matter of great public importance. Next, Petitioners assert that standing is proper by virtue of their positions as members of the state senate.

{7}	We need not reach the question of Petitioners' standing based on their membership in the state senate, as we conclude that this case presents a matter of great public importance. This Court has long recognized that we may, in our discretion, "grant standing to private parties to vindicate the public interest in cases

presenting issues of great public importance." *State ex rel. Sego v. Kirkpatrick,* 1974-NMSC-059, ¶ 7, 86 N.M. 359, 524 P.2d 975. Matters of "great public importance" are those that involve "clear threats to the essential nature of state government guaranteed to New Mexico citizens under their Constitution— a government in which the three distinct departments, legislative, executive, and judicial, remain within the bounds of their constitutional powers." *State ex rel. Coll v. Johnson,* 1999-NMSC-036, ¶ 21, 128 N.M. 154, 990 P.2d 1277 (ellipsis, internal quotation marks, and citation omitted). In this instance, Petitioners' claims require us to decide the bounds of the constitutional powers of the legislative and executive branches to spend federal funds. Such separation of powers claims present matters of great public concern conferring standing on Petitioners. *See State ex rel. Clark v. Johnson*, 1995-NMSC-048, ¶ 15, 120 N.M. 562, 904 P.2d 11 (concluding the claim "that the Governor has exercised the state legislature's authority" is a matter of "great public interest and importance" conferring standing (internal quotation marks and citation omitted)); *N.M. Bldg. & Constr. Trades Council v. Dean*, 2015-NMSC-023, ¶ 7, 353 P.3d 1212 ("The balance and maintenance of governmental power is of great public concern." (internal quotation marks and citation omitted)).

**B.    Mandamus**

{8}    Having determined that Petitioners have standing, we next consider whether a writ of mandamus is the proper method of relief. "Mandamus may be used either to compel the performance of an affirmative act where the duty to perform the act is clearly enjoined by law, or it may be used in a prohibitory manner to prohibit unconstitutional official action." *State ex rel. Riddle v. Oliver*, 2021-NMSC-018, ¶ 23, 487 P.3d 815 (ellipsis, internal quotation marks, and citation omitted). It is well-established that "[w]e have . . . original jurisdiction in mandamus in instances where a petitioner [seeks] to restrain one branch of government from unduly encroaching or interfering with the authority of another branch in violation of Article III, Section 1 of our state constitution." *Unite New Mexico v. Oliver*, 2019-NMSC-009, ¶ 2, 438 P.3d 343 (internal quotation marks and citation omitted); *see also Riddle*, 2021-NMSC-018, ¶ 23 ("Mandamus is often utilized to restrain one branch of government from encroaching on the powers reserved to another branch."). This case presents precisely such an instance. Petitioners ask us to issue a prohibitory writ restraining the Governor from encroaching on the authority of the legislative branch to appropriate money under Article IV, Section 30 of the New Mexico Constitution, which provides that "money shall be paid out of the treasury only upon appropriations made by the legislature." Therefore, mandamus is proper.

## C.  ARPA Is Broad With Few Limitations

{9}  ARPA provides four broad eligible uses of federal funds provided to the states:

(A) to respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID-19) or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality;

(B) to respond to workers performing essential work during the COVID-19 public health emergency by providing premium pay to eligible workers of the State, territory, or Tribal government that are performing such essential work, or by providing grants to eligible employers that have eligible workers who perform essential work;

(C) for the provision of government services to the extent of the reduction in revenue of such State, territory, or Tribal government due to the COVID-19 public health emergency relative to revenues collected in the most recent full fiscal year of the State, territory, or Tribal government prior to the emergency; or

(D) to make necessary investments in water, sewer, or broadband infrastructure.

42 U.S.C. § 802(c)(1)(A)-(D).[1]

{10} All four categories allow state governments broad discretion to determine how ARPA funds should be used. Indeed, the revenue loss provision is particularly flexible because this category allows governments to replenish their general funds as a result of a "reduction in revenue of such State . . . government due to the COVID-19 public health emergency." Section 802(c)(1)(C). If used to offset a reduction in revenue due to COVID-19, the limitations on the state are minimal, prohibiting only the use of the funds to offset tax cuts or to add to pension funds. Section 802(c)(2)(A)-(B). Further, because ARPA does not limit the percentage of funds that may be allocated to a certain category, a state retains the discretion to

---

[1] Unless otherwise specified, all references to 42 U.S.C. § 802 are to the 2021 version of ARPA in effect at the time we issued our writ of mandamus and accompanying order. After we issued the prohibitory writ in November 2021, Congress amended Section 802 to provide additional flexibility by adding an additional use category aimed at "provid[ing] emergency relief from natural disasters or the negative economic impacts of natural disasters, including temporary emergency housing, food assistance, financial assistance for lost wages, or other immediate needs." Section 802(c)(1)(E) (2022).

deposit the entirety of the awarded funds into a single category.[2] The broad discretion that states are given to determine how ARPA funds are used is also evidenced by the lack of any guidance or requirements governing the process by which states allocate these funds.

{11}    The accompanying federal regulations reinforce the broad nature for which ARPA funds can be used, setting out dozens of examples of eligible uses within the statutorily defined categories. *See generally* 31 C.F.R. § 35.6 (2021). For example, Category (b), Public Health Emergency or Its Negative Economic Impacts, lists twelve subcategories and twenty-two sub-subcategories of permissible uses.

---

[2]We recognize that the 2022 amendment to ARPA Section 802 categories imposed minimal limitations on the percentage of funds that may be allocated to infrastructure projects, while other categories remain free from limitations. *Compare* § 802(c)(5)(C)(i)(1)(aa)-(bb) (2022) (limiting the amount of funding to be used on infrastructure projects to the greater of "$10,000,000; and . . . 30 percent of such payment"), *with* § 802(c)(1)(A)-(B) (2022) (providing no limitation on the allocation of funds under these categories). This structure provides recipients with broad discretion to deposit all or significant portions of the awarded funds into a single category and also to forego allocating any funds for other categories. Therefore, subsequent amendments do not alter our conclusion.

31 C.F.R. § 35.6(b) (2021).[3] Importantly, the regulations are silent as to how the funds shall be distributed among the categories, subcategories, and sub-subcategories, thereby leaving significant discretion to each recipient.

{12}   The Interim Final Rule issued by the Secretary of the Treasury, which provides additional guidance to assist in the implementation of ARPA, reiterates the federal government's intention to give broad discretion to the states to use ARPA funds. The Interim Final Rule explains that "recipients have considerable flexibility to use [ARPA funds] to address the diverse needs of their communities." *Interim Final Rule*, 86 Fed. Reg. at 26806. For example, the Interim Rule addressing the category of public health and economic impacts, "*provides flexibility* for recipients to use payments . . . for programs or services *that are not identified on these non-exclusive lists* but that fall under the terms of [ARPA] by responding to the COVID-19 public health emergency or its negative economic impacts." *Id.* at 26788

---

[3]As with ARPA, the federal government subsequently amended the federal regulations. The amended version of the regulations is equally as broad and therefore does not alter our conclusion. *See* 31 C.F.R. § 35.6(b)(3)(i)(A)-(D) (2022) (listing four subcategories of eligible uses to address public health impacts, each of which include an extensive list of eligible uses ranging from contact tracing to payroll expenses related to community policing strategies, reductions in gun violence, and "investing in technology and equipment"); *id.* § 35.6(b)(3)(ii)(A)-(E) (encompassing five categories and seventeen expansive subcategories of negative economic impacts for which ARPA funds can be used).

(emphasis added).[4] The broad nature of the statute and the accompanying rules leaves to the states the responsibility to decide how best to use the ARPA funds.

**D.     Separation of Powers**

{13}     The flexible and broad nature of the funds raises the separation of powers question before us today. To answer this question, we consider the constitutionally defined powers of our legislative and executive branches, evaluating in particular whether the ARPA funds are more properly administered by the Governor or appropriated by the Legislature. Article III, Section 1 of the New Mexico Constitution provides:

> The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments, shall exercise any powers properly belonging to either of the others, except as in this constitution otherwise expressly directed or permitted.

---

[4]The Final Rule, promulgated by the Department of Treasury after we issued our prohibitory writ of mandamus and order, provides even greater flexibility. 87 Fed. Reg. 4338 (Jan. 27, 2022) (codified at 31 C.F.R. pt. 35). In general, it "provides broader flexibility and greater simplicity" beyond the flexibility provided within the Interim Rule. *Id*. at 4339. For example, "the final rule provides a broader set of enumerated eligible uses." *Id*. Such uses include "making affordable housing, childcare, and early learning services eligible in all impacted communities and making certain community development and neighborhood revitalization activities eligible for disproportionately impacted communities." *Id*. Moreover, even if a recipient uses ARPA funds in a manner that is beyond what is specifically enumerated, such use is permitted so long as the recipient satisfies a standard process set out in the Final Rule. *Id*. at 4339-40.

Article IV, Section 30 of the New Mexico Constitution reserves the power to appropriate to the Legislature, requiring that "money shall be paid out of the treasury only upon appropriations made by the legislature." Article IV, Section 30 draws no distinction between state and federal funds. The Governor, by contrast, is empowered to "take care that the laws be faithfully executed." N.M. Const. art. V, § 4; *see also State ex rel. Taylor v. Johnson*, 1998-NMSC-015, ¶ 22, 125 N.M. 343, 961 P.2d 768 ("A governor's proper role is the execution of the laws.").

{14}    Notwithstanding the specific powers reserved to the legislative and executive branches by our Constitution, we have recognized that "the constitutional doctrine of separation of powers allows some overlap in the exercise of governmental function," as "the absolute separation of governmental functions is neither desirable nor realistic." *Clark*, 1995-NMSC-048, ¶ 32 (internal quotation marks and citation omitted). Total compartmentalization and separation of functions between the executive and legislative branches would result in a state of dysfunction. *See id.* Even giving due weight to such overlap, however, "we have not been reluctant to intervene when one branch of government unduly interfere[s] with or encroach[es] on the authority or within the province of a coordinate branch of government." *Id*. (internal quotation marks and citation omitted). Our approach is one of practicality and common sense, which recognizes that "[a]lthough the executive, legislative, and

11

judicial powers [set out in our Constitution] are not hermetically sealed, they are nonetheless functionally identifiable one from another." *Id*. ¶ 33 (internal quotation marks and citation omitted).

{15}     In this instance, we must determine whether the Governor's authority to spend the ARPA funds is a permissible overlap under the separation of powers doctrine, or whether such an act would improperly infringe on the authority vested in the Legislature. *See id.* ¶ 34 ("The Governor may not exercise power that as a matter of state constitutional law infringes on the power properly belonging to the legislature."). To answer this question, we must determine "whether the Governor's action disrupts the proper balance between the executive and legislative branches." *Id*. Our assessment necessarily,

> focuses on the extent to which the action by one branch prevents another branch from accomplishing its constitutionally assigned functions. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of [the Legislature].

*Id*. ¶ 34 (brackets and internal quotation marks omitted) (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977)). "One mark of undue disruption would be an attempt to foreclose legislative action in areas where legislative authority is undisputed." *Id*. This approach strikes the appropriate balance between the

coordinate branches of government, while giving the required "effect to Article III, Section 1." *Id.* ¶ 32.

{16} Petitioners contend that the Governor improperly encroached on the authority of the Legislature because the ARPA funds were "made available to the state generally," and Congress did not designate them "for any specific state program or state agency." Because Congress did not specifically designate the funds, Petitioners argue, the ARPA funds are public money subject to legislative appropriation under Article IV, Section 30. The Governor responds that *Sego*, 1974-NMSC-059, established a categorical rule that the Legislature does not have authority to appropriate federal funds in any circumstance. She further asserts that because the funds are in a "suspense account" for funds that have not yet been earned pursuant to NMSA 1978, Section 6-10-3(C) (2011), they are not "in the state treasury" and are therefore beyond the reach of the appropriation requirement of Article IV, Section 30. Alternatively, she invites the Court to conclude that she retains control over the funds under a case-by-case approach developed by the Colorado Supreme Court.

{17} For the reasons outlined below, we do not agree that this Court's holding in *Sego*, 1974-NMSC-059, answers the question presented by this case. Nor are we persuaded that the type or location of the account where the ARPA funds have been

13

deposited is dispositive of the right to allocate those funds. Finally, we decline the Governor's invitation to adopt a bright-line rule that all federal funds fall outside the purview of the Legislature's power to appropriate. Instead, we adopt a more nuanced case-by-case approach that considers the amount of discretion left to the states to determine how best to expend federal funds.

**E.    *Sego* and *Carruthers***

{18}    Relying on *Sego*, 1974-NMSC-059, and *State ex rel. Coll v. Carruthers*, 1988-NMSC-057, 107 N.M. 439, 759 P.2d 1380, the Governor contends this Court has already concluded that federal funds received by the State are properly administered by the executive branch, rather than appropriated by the Legislature. Those cases, while informative, do not control the result of this proceeding. Further, our holding today does not have any bearing on the validity of either *Sego* or *Carruthers*.

{19}    In *Sego*, we focused on the constitutional mandate giving boards of regents "control and management" of the state's higher educational institutions, Art. XII, § 13, and the Legislature's encroachment on that authority by trying to appropriate and control the expenditure of funds granted or given to those institutions from sources other than the state. 1974-NMSC-059, ¶¶ 42-44, 51. The dispute did not involve a claim by the Governor that he had the power to administer those funds. William Sego, a state senator, sought a writ of mandamus commanding the Governor

14

and other executive branch officials to "treat as nullities certain vetoes attempted by the Governor" of legislation purporting to appropriate federal funds to institutions of higher education in New Mexico. *Id.* ¶¶ 1, 9, 41-51. Among the vetoes challenged by Sego was a veto of legislation giving the department of finance and administration authority to temporarily use excess funds appropriated to institutions of higher education, which included, among other things, federal funds and "funds in the form of scholarships, gifts, donations, private endowments or other gratuities received from an outside source." *Id.* ¶ 41. To determine whether the Legislature was acting within the scope of its power, we considered "the authority of the Legislature to appropriate and control non-state funds available to these educational institutions." *Id.* ¶ 45. Relying on Article XII, Section 13 of the New Mexico Constitution, we explained that the "powers of control and management of each of these [affected] institutions is vested in a Board of Regents," which supported our holding that the Legislature "has no power to appropriate and thereby endeavor to control the manner and extent of the use or expenditure of Federal funds made available to our institutions of higher learning."[5] *Id.* ¶¶ 49-51. Instead, the Court concluded, "[c]ontrol over the expenditure of these funds rests with the Federal

---

[5]Since *Sego*, Article XII, Section 13 has been amended multiple times and this does not affect our analysis.

government and the Boards of Regents of the respective institutions." *Id*. ¶ 51. The *Sego* Court did not consider the Governor's authority to administer federal funds, as it was not at issue in that case and it does not control the outcome of this proceeding.

{20} In reaching its conclusion, *Sego* quoted with approval the Supreme Court of Colorado's opinion in *MacManus v. Love*, 499 P.2d 609 (Colo. 1972), which "held 'that federal contributions are not the subject of the appropriative power of the legislature' and the Legislature's attempt to do so was . . . void as an infringement upon the executive function of administration." *Sego*, 1974-NMSC-059, ¶ 50. The Governor argues that our approval of the statement in *MacManus* supports the conclusion that this Court intended to create a categorical ruling that all federal funds are subject to the administration by the executive and not appropriation by the Legislature. Rather than announcing a categorical rule in *Sego*, however, we specifically concluded that Article XII, Section 13 controlled the manner in which the funds were spent and that the control over the funds at issue in that case "rest[ed] with the Federal government and the Boards of Regents of the respective institutions." *Sego*, 1974-NMSC-059, ¶ 51. *MacManus* was quoted to support our conclusion in *Sego* that the New Mexico Constitution provided a specific mandate that boards of regents, and not the Legislature, were authorized to direct federal funds received by institutions of higher learning. *See id*. ¶¶ 48-51. It did not establish

16

a categorical rule regarding appropriation of federal funds. And, rather than give the Governor exclusive control over the funds at issue in *Sego*, as she requests in this proceeding, we concluded that those funds were subject to the state constitutional mandate set out in Article XII, Section 13, giving control and management to the board of regents of each institution of higher learning. *Id.*

{21} Furthermore, in the half-century since *MacManus* was decided, Colorado case law has evolved. Although the Supreme Court of Colorado has acknowledged that it stated "rather broadly [in *MacManus*] that federal contributions are not subject to appropriations by the legislature," it now recognizes that federal funds can be subject to the legislative appropriation process. *See In re Interrogatories Submitted by Gen. Assembly on House Bill 04-1098*, 88 P.3d 1196, 1203 (Colo. 2004) (rejecting the broad holding in *MacManus* that federal funds are not subject to legislative appropriation because "some funds deriving from the federal government are more akin to state moneys, and therefore subject to legislative appropriation"). Having examined the development of its own case law, Colorado has adopted a case-by-case approach focused on the nature of the specific grant or appropriation before the court.

{22} We therefore decline the Governor's invitation to interpret this Court's holding in *Sego* as a broad categorical rule that all federal funds are beyond

17

legislative appropriation. *Sego* did not consider expenditure of federal funds generally, only those funds "made available to our institutions of higher learning," 1974-NMSC-059, ¶ 51, and we will not rely on *Sego* for a proposition that it did not consider. *See Dominguez v. State*, 2015-NMSC-014, ¶ 16, 348 P.3d 183 ("The general rule is that cases are not authority for propositions not considered." (brackets, internal quotation marks, and citation omitted)).

{23} *Carruthers*, likewise, does not support the Governor's view that the Legislature does not have authority to appropriate federal funds no matter the circumstance. The Governor argues that, because we did not clarify in *Carruthers* that our holding in *Sego* "was limited to institutions of higher learning," we "strongly implied" that *Sego* created a categorical rule prohibiting legislative appropriation of *all* federal funds. As an initial matter, we disagree that *Sego* required clarification. In *Sego*, 1974-NMSC-059, ¶ 48, we expressly stated that "[a]s to the authority of the Legislature to appropriate non-state funds available to the institutions of higher learning, we are of the opinion that the Legislature lacks authority to appropriate these funds or to control the use thereof through the power of appropriation." Thus, our limitation of *Sego* to "non-state funds available to the institutions of higher learning," *id.*, as opposed to *all* non-state funds was clear.

18

{24} Turning to *Carruthers*, the Legislature in that case appropriated funds through the General Appropriation Act of 1988, and the Governor vetoed several portions of the legislation. 1988-NMSC-057, ¶ 2. As relevant here, one portion of the legislation at issue in *Carruthers* appropriated certain funds, which included federal funds, for data processing services. *Id.* ¶ 23. Although the Governor in *Carruthers* supported his veto with some general reasoning that the Legislature cannot appropriate federal funds, he did not attempt to veto the Legislature's appropriation of federal funding. *Id.* ¶¶ 23-24 (explaining that the Governor's objection was to the Legislature's mandate that the funds be used to purchase a *specific system* from a *specific contractor*). Instead, *Carruthers* confirms that *Sego* addressed the New Mexico Constitution's particular mandate that authorizes boards of regents, not the Legislature, to direct federal funds received by institutions of higher learning. *Id.* Therefore, the veto presented to this Court did not attempt to prohibit the Legislature from appropriating any federal funds, but with a veto that prohibited the Legislature from directing the specific system and specific contractor to be used. *See id.*

{25} To hold that the Legislature lacks the authority to appropriate federal funds under any circumstance would contradict *Carruthers*, where we relied on *Sego* to explain that "the legislature 'has the power, and perhaps the duty, in appropriating State monies to consider the availability of Federal funds for certain purposes.'"

19

*Carruthers*, 1988-NMSC-057, ¶ 23 (quoting *Sego*, 1974-NMSC-059, ¶ 51). Instead, this Court's explanation in *Carruthers* aligns with our view that *Sego* focused on the notion that the New Mexico Constitution provided a specific mandate that authorized boards of regents, and not the Legislature, to direct federal funds received by institutions of higher learning, rather than to establish a categorical rule regarding appropriation of federal funds. *See id.* This reading is consistent with the remainder of *Carruthers* where we stated that "[w]ith few exceptions, money shall be paid out of the public treasury only upon appropriations made by the legislature." *Id.* ¶ 5. Because the power to appropriate rests with the Legislature, the Governor retains "only a negative power to disapprove; it is not the power to enact or create new legislation." *Id.* ¶ 6.

{26}     The Court in *Carruthers* took issue with the Legislature placing improper conditions on appropriations when it "limited the expenditure of appropriated funds to a specific system and a specific contractor," thereby eliminating the Governor's discretion to exercise his executive management function. *Id.* ¶ 24. ("We have previously observed . . . that conditions and restrictions on appropriations which reserve to the legislature 'powers of close supervision' over the executive function are not looked upon with favor." (citation omitted)). The Legislature's conduct in this regard fell outside the confines of "its traditional oversight and appropriation

20

functions" because it left the Governor without discretion to exercise his management of the funds. *Id*. But we did not hold that the Legislature is without authority to appropriate federal funds no matter the circumstance. Indeed, the Legislature's appropriation of federal funds in *Carruthers* remained intact. *See id.* ¶ 23 (retaining the Legislature's appropriation of federal funds even after the veto struck the provision placing specific contractor and system conditions on the appropriation). This close examination of *Carruthers* cuts against the Governor's assertion that *Carruthers* created a bright-line rule precluding legislative appropriation of federal funds under any circumstances. Further, we decline to adopt an approach that would categorically exclude the Legislature from ever appropriating federal funds. Because neither *Sego* nor *Carruthers* answers the question before us today, we look to the text of our Constitution and relevant statutes.

**F.    Constitutional and Statutory Framework to Appropriate and Administer Money in the State's Possession**

{27}    Our statutes and Constitution set forth the process for handling money received on behalf of the state. Section 6-10-3 provides that "[a]ll public money in the custody or under the control of any state official or agency obtained or received by any official or agency from any source . . . shall be paid into the state treasury." And, "except interest or other payments on the public debt, money shall be paid out of the treasury only upon appropriations made by the legislature." N.M. Const. art.

21

IV, § 30. The Legislature, however, has recognized that on occasion state officials receive funds that are not currently and may never become public money. The Legislature established a process to account for and administer funds on such occasions where those funds are not yet property of the state. Section 6-10-3(C) provides that

> every official or person in charge of any state agency receiving any money . . . which money has not yet been earned so as to become the absolute property of the state, shall deliver or remit to the state treasury . . . which money shall be deposited in a suspense account to the credit of the proper official, person, board or bureau in charge of any state agency so receiving the money.

"All unearned moneys deposited in a suspense account with the state treasurer . . . shall, as soon as the same shall become the absolute property of the state of New Mexico, be transferred out of said suspense account to the proper fund." NMSA 1978, § 6-10-41 (1977).

{28} Petitioners contend that the ARPA funds are subject to legislative appropriation because they are located within the state treasury. In response, the Governor contends that the funds fall outside the legislative appropriation requirement because they are located in a suspense account within the treasury and are subject to conditions, including repayment if misused, such that the funds are not the absolute property of the state. As explained later in further detail, we disagree that the fund's location within the treasury—whether within a suspense account or

the general fund—is dispositive or even relevant. However, we agree that the limitations imposed on a state as a condition for receiving such funds from the federal government are relevant. Conditions imposed by the federal government that specify how funds are to be used do not require legislative appropriation and allow the executive branch to simply execute the law by adhering to a federally pre-established purpose. By contrast, federal funds provided with a broad or discretionary purpose such that they can be put to a variety of uses must be appropriated by the Legislature. Because our Constitution and statutory scheme do not appear to create a distinction between funds that are received from the federal government and funds that are generated by the state, we look to approaches adopted in other states to assist us in our examination of what factors or conditions ultimately determine which branch of government controls the funds.

## G.  Other States

{29}  Other states have addressed similar separation of power questions by considering the nature and purpose of the federal funds at issue. In determining "whether certain moneys fall under the powers of the legislative or executive branch," Colorado primarily examines "whether those moneys constitute general state funds or custodial funds." *In re Interrogatories*, 88 P.3d at 1200. This examination involves

distinguish[ing] between funds akin to state moneys, which allow the state broad flexibility in determining how such funds should be used, and therefore become part of the state's general fund, and custodial funds, which are to be used only in the manner specified and for the purposes designated by the federal government.

*Id.* at 1202.

{30} Under this approach, Colorado has established that noncustodial funds are subject to legislative appropriation, while custodial funds "fall outside the scope of legislative authority and instead are subject to executive control." *Id.* at 1202-03. "[W]hen evaluating whether certain moneys constitute custodial funds," Colorado considers all circumstances regarding the funds, including "the source of the funds, the degree of flexibility afforded to the state as to the process by which the funds should be allocated, and the degree of flexibility afforded to the state as to the funds' ultimate purposes." *Id.* at 1202.

{31} Oklahoma, like Colorado, distinguishes between custodial and noncustodial funds when presented with a separation of powers issue. *See Application of State ex rel. Dep't of Transp.*, 1982 OK 36, ¶ 10, 646 P.2d 605, 609-10. However, Oklahoma does not specifically rely on enumerated factors in assessing whether a fund will be custodial, instead focusing on whether the federal funds are held in trust for a specific purpose. *See id.* In applying this principle to grant-in-aid programs, the Supreme Court of Oklahoma noted that "[f]ederal money deposited in the state treasury

24

pursuant to some grant-in-aid program is held in trust for a specific purpose. Like other custodial funds, it retains its original legal character. The legislature wields no authority over such funds." *Id.* (footnote omitted). When these federal deposits take place, the Legislature "may not subvert congressional policy by diverting the money to another purpose." *Id.* ¶ 10, at 610.

{32}   The Massachusetts high court likewise recognizes that only certain federal funds fall outside the Legislature's power to appropriate. In assessing whether federal funds are subject to appropriation or are merely held in trust, Massachusetts focuses on whether the federal funds "are received by State officers or agencies subject to the condition that they be used only for objects specified by Federal statutes or regulations." *Opinion of the Justs. to the Senate*, 378 N.E.2d 433, 436 (Mass. 1978). When the funds are received with specific conditions attached, "the money is impressed with a trust and is not subject to appropriation by the Legislature." *Id.* In that circumstance, "[t]he recipient of such funds has no choice but to comply with the requirements imposed by Federal law." *Id.* The court explained, however, that not all funds received from the federal government would be held in trust. *Id.* Instead, "[f]ederal reimbursements may be made to a State without conditions imposed as to expenditure." *Id.* When this occurs, the "money would be subject to the legislative power of appropriation." *Id.*

25

{33}     We glean from these cases that the answer to the separation of powers question lies in a case-by-case examination of the amount of discretion that the federal government affords to state recipients in spending federal funds. When the funds come with specific conditions attached, the executive branch is merely administering the funds consistent with the requirements established by the federal government and no legislative appropriation is required. If a state retains wide discretion, then such funds must be appropriated—a function constitutionally reserved for the Legislature.

## H.     The ARPA Funds Are Subject to Legislative Appropriation

{34}     Today, we adopt a totality of the circumstances approach to determine whether the legislative or executive branch has the power to spend ARPA funds. The amount of discretion the federal government left to New Mexico in allocating the ARPA funds compels us to conclude that they are subject to legislative appropriation. We base our conclusion on the language of ARPA, which includes broad categories bestowing vast discretion on state recipients, as well as federal regulations and rules reinforcing such flexibility through numerous categories and subcategories covering a wide array of eligible uses, even allowing recipients to allocate funds to programs or services that are not explicitly enumerated as long as they "meet the objectives" of the statute. U.S. Dept. of the Treasury, *2021 Interim*

26

*Final Rule: Frequently Asked Questions*, Section 2.3 (2023), https://home.treasury.gov/system/files/136/SLFRPFAQ.pdf (last visited October 3, 2023). We reiterated in *State ex rel. Smith v. Martinez* that the "New Mexico Constitution vests the power to appropriate money *exclusively* with the Legislature," and that "a law making an appropriation must 'distinctly specify the sum appropriated and the object to which it is to be applied.'" 2011-NMSC-043, ¶ 4, 150 N.M. 703, 265 P.3d 1276 (emphasis added) (citing N.M. Const. art. IV, § 16; quoting N.M. Const. art. IV, § 30). The Governor, on the other hand, retains the power to "'approve or disapprove any part or parts, item or items, of any bill appropriating money . . . .'" *Id.* (quoting N.M. Const. art. IV, § 22).

{35} The number of eligible uses contained within ARPA is simply too broad to allow the executive to administer or execute the funds without infringing on the Legislature's constitutional duty to appropriate. This broad flexibility embedded within ARPA is evidence of significant discretion, such that the Governor, if she were to control these funds, would not be able to allocate the funds through the mere "execution" of the laws. *See* N.M. Const. art. V, § 4 (empowering the Governor to execute the law). Instead, the Governor would be required to exercise the Legislature's constitutional prerogative to assess "how, when, and for what purpose" the ARPA funds would be used. *State ex rel. Schwartz v. Johnson*, 1995-NMSC-

080, ¶ 14, 120 N.M. 820, 907 P.2d 1001 (internal quotation marks and citation omitted) ("The legislature must exercise its exclusive power of deciding how, when, and for what purpose the public funds shall be applied in carrying on the government." (internal quotation marks and citation omitted)).

{36} For example, even if we focused solely on the first eligible use category—Public Health/Negative Economic Impacts—the Governor would need to choose between twelve subcategories and twenty-two sub-subcategories of permissible uses within that broad category. 31 C.F.R. § 35.6(b) (2021). Alternatively, the Governor could forego funding that category at all, instead focusing on the premium pay or revenue loss categories. Or, at her discretion, the Governor could use ARPA funds "for programs or services *that are not identified on these non-exclusive lists* but that fall under the terms of [ARPA] by responding to the COVID-19 public health emergency or its negative economic impacts." *Interim Final Rule*, 86 Fed. Reg. at 26788 (emphasis added).

{37} If the Governor were to unilaterally control how ARPA funds are spent, she would exceed her power to execute the laws and infringe on the Legislature's appropriation power—a power that is constitutionally vested in the legislative branch by Article IV, Section 30. *Clark*, 1995-NMSC-048, ¶ 34 ("The Governor may not exercise power that as a matter of state constitutional law infringes on the

28

power properly belonging to the legislature."). Just as the Legislature did not have the authority to infringe on the "executive management function" in *Carruthers*, 1988-NMSC-057, ¶ 24, so, too, the executive does not have the authority to intrude on the Legislature's exclusive authority to appropriate funds. This is a proper balance of power between the coordinate branches of government.

{38} If the executive was allowed to unilaterally spend the ARPA funds absent prior appropriation, it would "disrupt[] the proper balance between the executive and legislative branches" because it is indisputable that the power to appropriate money falls exclusively within the purview of the legislative branch. *Clark*, 1995-NMSC-048, ¶ 34 ("One mark of undue disruption [of the proper balance between the executive and legislative branches] would be an attempt to foreclose legislative action in [an area] where legislative authority is undisputed."); *Smith*, 2011-NMSC-043, ¶ 4 (explaining that our Constitution vests appropriation power with the Legislature). We cannot allow such an unconstitutional infringement on the legislative branch of government.

**I.     Suspense Funds**

{39} In an attempt to avoid such infringement, the Governor contends that the ARPA funds are "properly held in a suspense account pursuant to" Sections 6-10-3(C) and 6-10-41 because the funds "ha[ve] not yet been earned so as to become

29

absolute property of the state." The Governor reasons that because the funds are held in suspense, they "do not implicate Article IV, Section 30's appropriation requirement because they fall outside of the state treasury." The Governor submitted an affidavit from the Secretary for the New Mexico Department of Finance and Administration (DFA), who affirmed that the ARPA funds are in a suspense account. She also affirmed that she is responsible for the DFA's exercise of its statutory authority to make disbursements from accounts maintained by the Treasurer's office, including from those funds held in suspense accounts. According to her affidavit, the ARPA funds were deposited into suspense accounts, coded as "unearned revenue," and treated as liabilities instead of assets for audit purposes.

{40} Upon close examination, we conclude that Section 6-10-3 is an accounting provision that does not remove the ARPA funds from the treasury or impact the constitutional separation of powers analysis that we must engage in when we are assessing whether it is the legislative or the executive branch that controls the funds at issue. For this reason, we decline to allow coding procedures for auditing or accounting purposes to subvert or determine the branch of government authorized to appropriate funds when our Constitution explicitly provides that "money shall be paid out of the treasury only upon appropriations made by the legislature." N.M. Const. art. IV, § 30.

## J. Funds Held in Suspense Accounts Become the Property of the State Before They Are Spent

{41} Even assuming that the use of a suspense account should control which branch of government has the power to spend the ARPA funds, at oral argument the Governor advanced that the ARPA funds are not earned until the funds are "spent, reported, and approved by the federal government." Counsel for the Governor argued, "If [the funds are] unearned, [the funds] should not be in the state treasury and therefore [are not] subject to appropriation pursuant to Article IV, Section 30."

{42} We are unconvinced. Once state moneys are "earned so as to become the absolute property of the state" under Section 6-10-3(C), the moneys shall "be transferred out of said suspense account to the proper fund." Section 6-10-41. Fundamentally, a suspense account is a temporary holding account where the funds are placed while a decision is being made as to their classification. *See Black's Law Dictionary*, 24 (11th ed. 2019) (defining a *suspense account* as a "temporary record used in bookkeeping to track receipts and disbursements of an uncertain nature until they are identified and posted in the appropriate ledgers and journals"). If the predicate has been satisfied, the funds must, by statute, be transferred into "the proper fund." Section 6-10-41. Therefore, the Governor's argument that the ARPA funds are not earned until they are spent is unpersuasive because the funds must be

31

transferred from the suspense account into the proper fund before they are spent—not after.

### III. CONCLUSION

{43} For the foregoing reasons, we hold that the ARPA funds are subject to legislative appropriation and so have granted a prohibitory writ of mandamus that Governor Michelle Lujan Grisham and State Treasurer Tim Eichenberg shall not "transfer, encumber, commit, expend, or appropriate any additional [ARPA] funds . . . absent legislative appropriation."

{44} **IT IS SO ORDERED.**

_____
**JULIE J. VARGAS, Justice**

**WE CONCUR:**


_____
**C. SHANNON BACON, Chief Justice**


_____
**MICHAEL E. VIGIL, Justice**


_____
**DAVID K. THOMSON, Justice**


_____
**BRIANA H. ZAMORA, Justice**

32